NATALIE K. WIGHT, OSB #035576
United States Attorney
District of Oregon
**RYAN W. BOUNDS, OSB #000129**
Ryan.Bounds@usdoj.gov
**CHRISTOPHER L. CARDANI, MAB #550609**
Christopher.Cardani@usdoj.gov
**SIDDHARTH DADHICH, TSB #24096310**
Siddharth.Dadhich@usdoj.gov
Assistant United States Attorneys
1000 SW Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **3:20-cr-00228-SI** |
| **v.** | **GOVERNMENT'S TRIAL BRIEF** |
| **ROBERT J. JESENIK,**<br>**ANDREW N. MacRITCHIE, and**<br>**BRIAN K. RICE,** | |
| **Defendants.** | |

    The United States of America submits this trial brief to assist the Court during the trial of

this matter.

/ / /

/ / /

/ / /

/ / /

**Government's Trial Brief**                                                          **Page 1**

## TABLE OF CONTENTS

I.    STATUS OF THE CASE ................................................................................ 10

II.   STATEMENT OF FACTS ............................................................................ 11

III.  ELEMENTS OF THE OFFENSES AND LEGAL ISSUES ........................ 28

   A.  Conspiracy to Commit Mail and Wire Fraud (Count 1) ......................... 29

     1.  The Agreement ................................................................................ 30

     2.  Knowledge of and Association with Other Conspirators ................ 31

     3.  *Pinkerton* Liability ......................................................................... 32

   B.  Wire Fraud (Counts 2 through 29) ........................................................ 33

     1.  Elements ......................................................................................... 33

     2.  The Scheme to Defraud ................................................................. 34

     3.  Materiality ...................................................................................... 35

     4.  The Intent to "Deceive and Cheat" ................................................ 37

     5.  Use of Wires in Interstate Commerce ........................................... 38

   C.  Conspiracy to Commit Money Laundering (Count 30) .......................... 39

   D.  False Statement on a Loan Application (Count 31) ............................... 41

   E.  Anticipated Defenses ............................................................................ 44

IV.   EVIDENTIARY ISSUES ............................................................................ 44

   A.  Stipulations ........................................................................................... 44

   B.  Defendants' Statements and Admissions ............................................... 45

   C.  Statements by Defendants' Employees and Agents ............................... 46

   D.  Coconspirator and Co-Schemer Statements .......................................... 48

   E.  Non-hearsay Statements Offered for Notice, Intent, and Effect on Listener ........... 50

   F.  Hypothetical Questions .......................................................................... 51

   G.  Documentary Evidence ......................................................................... 53

     1.  Foundation and Authentication ..................................................... 54

     2.  Emails and Other Business Records .............................................. 55

   H.  Summary Exhibits and Witnesses ......................................................... 58

   I.  Demonstrative Exhibits .......................................................................... 60

   J.  Federal Rule of Evidence 404(b) Notice ............................................... 60

   **K.** **Expert Testimony** ........................................................................................................ 62

**V.** **JUROR NOTEBOOKS** ......................................................................................................... 62

**VI.** **FORFEITURE ALLEGATIONS** .......................................................................................... 62

**VII.** **CONCLUSION** ......................................................................................................................... 63

## TABLE OF AUTHORITIES

*Bourjaily v. United States*, 483 U.S. 171 (1987) .......................................................................... 48

*Calmat Co. v. U.S. Dep't of Lab.*, 364 F.3d 1117 (9th Cir. 2004) ................................................ 50

*Crawford v. Washington*, 541 U.S. 36 (2004) ............................................................................... 50

*Gallego v. United States*, 276 F.2d 914 (9th Cir. 1960) ............................................................... 54

*Garlington v. O'Leary*, 879 F.2d 277 (7th Cir. 1989) .................................................................. 49

*George v. Celotex Corp.*, 914 F.2d 26 (2d Cir. 1990) .................................................................. 50

*Gibbs v. State Farm Mut. Ins. Co.*, 544 F.2d 423 (9th Cir. 1976) ................................................ 50

*Goldberg v. United States*, 789 F.2d 1341 (9th Cir. 1986). .................................................... 58, 59

*Haddad v. Lockheed Ca. Corp.*, 720 F.2d 1454 (9th Cir. 1983) .................................................. 51

*Henderson v. United States*, 568 U.S. 266 (2013) ........................................................................ 41

*Keith v. Volpe*, 858 F.2d 467 (9th Cir. 1988) ............................................................................... 59

*La Porte v. United States*, 300 F.2d 878 (9th Cir. 1962) .............................................................. 55

*Monotype Corp. v. Int'l Typeface Corp.*, 43 F.3d 443 (9th Cir. 1994) ........................................ 56

*Neder v. United States*, 527 U.S. 1, 20-25 (1999) .................................................................. 35, 36

*Paddack v Dave Christensen, Inc.*, 745 F.2d 1254 (9th Cir. 1984) .............................................. 58

*Pereira v. United States*, 347 U.S. 1, 8-9 (1953) ......................................................................... 39

*Phillips v. United States*, 356 F.2d 297 (9th Cir. 1965) ............................................................... 53

*Rosemond v. United States*, 134 S. Ct. 1240 (2014) ..................................................................... 43

*Schmuck v. United States*, 489 U.S. 705 (1989) ........................................................................... 38

*Shaw v. United States*, 137 S. Ct. 462 (2016) ............................................................................... 37

*United States Collazo*, 984 F.3d 1308 (9th Cir. 2021) ................................................................. 39

*United States Jaimez*, 45 F.4th 1118 (9th Cir. 2022) .............................................................. 39, 41

*United States v. Agne*, 214 F.3d 47 (1st Cir. 2000) ...................................................................... 47

*United States v. Alghazouli*, 517 F.3d 1179 (9th Cir. 2008) ........................................................ 39

*United States v. Allen*, 425 F.3d 1231 (9th Cir. 2005) .................................................................. 50

*United States v. Alvarez-Valenzuela*, 231 F.3d 1198 (9th Cir. 2000) .......................................... 32

*United States v. Anekwu*, 695 F.3d 967 (9th Cir. 2012) ............................................................... 59

*United States v. Ayers*, 924 F.2d 1468 (9th Cir. 1991) ................................................................. 61

*United States v. Balwani*, No. 5:18-CR-00258-EJD-1, 2022 WL 597040 (N.D. Cal. Feb. 28, 2022)................................................................................................................................ 56

*United States v. Beckman*, 298 F.3d 788 (9th Cir. 2002)............................................... 61

*United States v. Beecroft*, 608 F.2d 753 (9th Cir. 1979)................................................ 51

*United States v. Bibbero*, 749 F.2d 588 (9th Cir. 1984) ................................................ 31

*United States v. Blitz*, 151 F.3d 1002 (9th Cir. 1998).................................................... 35

*United States v. Boulware*, 470 F.3d 931 (9th Cir. 2006).............................................. 59

*United States v. Brian A. Oliver*, No. 3:19-cr-00132-MO (D. Or.) ............................. 10

*United States v. Bueno-Sierra*, 99 F.3d 375 (11th Cir. 1996)....................................... 56

*United States v. Carpenter*, 923 F.3d 1172 (9th Cir. 2019)......................................... 60

*United States v. Carpenter*, 95 F.3d 773 (9th Cir. 1996)............................................. 36

*United States v. Castro*, 887 F.2d 988 (9th Cir. 1989) ................................................ 50

*United States v. Catabran*, 836 F.2d 453 (9th Cir. 1988)............................................ 55

*United States v. Childs*, 5 F.3d 1328 (9th Cir. 1993).................................................... 55

*United States v. Chinasa*, 489 Fed. App'x. 682 (4th Cir. 2012).................................. 29

*United States v. Chu Kong Yin,* 935 F.2d 990 (9th Cir. 1991)...................................... 54

*United States v. Cloud*, 872 F.2d 846 (9th Cir. 1989) ................................................. 34

*United States v. Cone*, 714 F.3d 197 (4th Cir. 2013)................................................... 56

*United States v. Cusino,* 694 F.2d 185 (9th Cir.1982).................................................. 38

*United States v. Cuti*, 720 F.3d 453 (2d Cir. 2013) ..................................................... 52

*United States v. Daneshvar*, 925 F.3d 766 (6th Cir. 2019).......................................... 56

*United States v. Davoudi*, 172 F.3d 1130 (9th Cir. 1999) ............................................ 43

*United States v. De Peri*, 778 F.2d 963 (3d Cir. 1985)................................................. 59

*United States v. Duran*, 189 F.3d 1071 (9th Cir. 1999)................................................ 32

*United States v. Eason*, 579 Fed. App'x. 807 (11th Cir. 2014) .................................... 29

*United States v. Escalante*, 637 F.2d 1197 (9th Cir. 1980) ......................................... 31

*United States v. Fernandez*, 839 F.2d 639 (9th Cir. 1988) .......................................... 46

*United States v. Fishman*, 645 F.3d 1175 (10th Cir. 2011) .......................................... 29

*United States v. Flom*, 558 F.2d 1179 (5th Cir. 1977).................................................. 55

*United States v. Garlick,* 240 F.3d 789 (9th Cir. 2001)........................................... 38, 39

*United States v. Gibson,* 690 F.2d 697 (9th Cir. 1982) ................................................... 47

*United States v. Goldtooth*, 754 F.3d 763 (9th Cir. 2014) .............................................. 43

*United States v. Gonzalez*, 906 F.3d 784 (9th Cir. 2018) ............................................... 30

*United States v. Grasso*, 724 F.3d 1077 (9th Cir. 2013) ........................................... 31, 33

*United States v. Green*, 523 F.2d 229 (2d Cir. 1975) ..................................................... 32

*United States v. Halbert*, 640 F.2d 1000 (9th Cir. 1981) ............................................... 36

*United States v. Halbert*, 712 F.2d 388 (9th Cir. 1983) ................................................ 36

*United States v. Harrington*, 923 F.2d 1371 (9th Cir. 1991) ......................................... 54

*United States v. Henry*, 984 F.3d 1343 (9th Cir. 2021) ................................................. 32

*United States v. Holden*, 908 F.3d 395 (9th Cir. 2018) ................................................. 37

*United States v. Holguin*, 51 F.4th 841 (9th Cir. 2022) ................................................. 62

*United States v. Holmes*, No. 5:18-CR-00258-EJD-1, 2022 WL 4086525 (N.D. Cal. Sept. 6, 2022) ............................................................................................................................. 29

*United States v. Hussain*, No. 16-CR-00462-CRB, 2018 WL 3619797 (N.D. Cal. July 30, 2018) ............................................................................................................................. 29

*United States v. Iribe*, 564 F.3d 1155 (9th Cir. 2009) ................................................... 30

*United States v. Jennings*, 487 F.3d 564 (8th Cir.2007) ............................................... 52

*United States v. Jinian*, 725 F.3d 954 (9th Cir. 2013) ................................................... 34

*United States v. Johnson*, 594 F.2d 1253 (9th Cir. 1979) ............................................. 58

*United States v. Kahre*, 610 F. Supp. 2d 1261 (D. Nev. 2009) ...................................... 57

*United States v. Kaplan*, 836 F.3d 1199 (9th Cir. 2016) ............................................... 30

*United States v. Kearney*, 560 F.2d 1358 (9th Cir. 1977) ......................................... 31, 32

*United States v. Killough*, 848 F.2d 1523 (11th Cir. 1988) ........................................... 58

*United States v. Kimbrew*, 406 F.3d 1149 (9th Cir. 2005) ............................................ 39

*United States v. King*, 200 F.3d 1207 (9th Cir. 1999) ................................................... 61

*United States v. Kirk*, 844 F.2d 660 (9th Cir. 1988) ................................................ 47, 51

*United States v. Krasovich*, 819 F.2d 253 (9th Cir. 1987) ............................................ 31

*United States v. Laurienti*, 611 F.3d 530 (9th Cir. 2010) ........................................ 51, 52

*United States v. Lechuga*, 888 F.2d 1472 (5th Cir. 1989) ............................................. 49

*United States v. Lemire*, 720 F.2d 1327 (D.C. Cir. 1983) ............................................. 60

*United States v. LeVeque*, 283 F.3d 1098 (9th Cir. 2002) ............................................................ 36

*United States v. Lischewski*, 860 F. App'x 512 (9th Cir. 2021) ............................................ 56, 57

*United States v. Lo,* 231 F.3d 471 (9th Cir. 2000) ...................................................................... 38

*United States v. Lonich*, 23 F.4th 881 (9th Cir. 2022) ................................................................ 41

*United States v. Lothian*, 976 F.2d 1257 (9th Cir. 1992) ............................................................ 35

*United States v. Loveland*, 825 F.3d 555 (9th Cir. 2016) ............................................................ 30

*United States v. Lyons*, 472 F.3d 1055 (9th Cir. 2007)................................................................ 36

*United States v. Mastelotto*, 717 F.2d 1238 (9th Cir. 1983) ...................................................... 38

*United States v. Maze*, 414 U.S. 395 (1974)................................................................................ 38

*United States v. Meyers*, 847 F.2d 1408 (9th Cir. 1988) ....................................................... 31, 58

*United States v. Millegan*, No. 3:19-CR-00528-IM, 2022 WL 1913289 (D. Or. June 2, 2022) .. 56

*United States v. Miller*, 664 F.2d 94 (5th Cir. 1981) ................................................................... 49

*United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020) ......................................................... 37, 38

*United States v. Montgomery*, 384 F.3d 1050 (9th Cir. 2004)................................................ 30, 35

*United States v. Moran*, 759 F.2d 777 (9th Cir. 1985) ............................................................... 45

*United States v. Moreland*, 622 F.3d 1147 (9th Cir. 2010) ........................................................ 39

*United States v. Nazemian*, 948 F.2d 522 (9th Cir. 1991) .......................................................... 49

*United States v. Olaf Janke*, Case No. 3:19-CR-00237-SI (D. Or.) ........................................... 10

*United States v. Olano*, 62 F.3d 1180 (9th Cir. 1995) ................................................................ 31

*United States v. Oplinger*, 150 F.3d 1061 (9th Cir. 1998)........................................................... 34

*United States v. Ortega*, 203 F.3d 675 (9th Cir. 2000)............................................................... 45

*United States v. Paris*, 827 F.2d 395 (9th Cir. 1987).................................................................. 48

*United States v. Parker*, 749 F.2d 628 (11th Cir. 1984) ............................................................ 56

*United States v. Pascacio-Rodriguez*, 749 F.3d 353 (5th Cir. 2014)........................................... 29

*United States v. Paxon*, 861 F.2d 730 (D.C. Cir. 1988).............................................................. 47

*United States v. Perry*, 550 F.2d 524 (9th Cir. 1997) ................................................................. 52

*United States v. Peterson*, 538 F.3d 1064 (9th Cir. 2008) .......................................................... 36

*United States v. Pinkerton*, 328 U.S. 640 (1946)................................................................... 32, 33

*United States v. Powell*, 982 F.2d 1422 (10th Cir. 1992); ........................................................... 48

*United States v. Ranney*, 719 F.2d 1183 (1st Cir. 1988)............................................................. 52

*United States v. Ray*, 930 F.2d 1368 (9th Cir. 1990). ................................................... 55

*United States v. Razo-Quiroz*, No. 1:19-CR-00015 DADBAM, 2019 WL 3035556 (E.D. Cal.

July 11, 2019) .............................................................................................................. 57

*United States v. Reed*, 575 F.3d 900 (9th Cir. 2009) .................................................... 31

*United States v. Rioux*, 97 F.3d 648 (2d Cir. 1996) ...................................................... 46

*United States v. Rizk*, 660 F.3d 1125 (9th Cir. 2011) .................................................... 31

*United States v. Rogers*, 321 F.3d 1226 (9th Cir. 2003) ................................................ 34

*United States v. Rogers*, 769 F.3d 372 (6th Cir. 2014) .................................................. 29

*United States v. Romero,* 282 F.3d 683 (9th Cir. 2002) .................................................. 30

*United States v. Roy*, 783 F.3d 418 (2d Cir. 2015) ........................................................ 29

*United States v. Rubino*, 431 F.2d 284 (6th Cir. 1970) ................................................. 59

*United States v. Santiago*, 837 F.2d 1545 (11th Cir. 1988) .......................................... 49

*United States v. Scales*, 594 F.2d 558 (6th Cir. 1979) .................................................. 60

*United States v. Scholl*, 166 F.3d 964 (9th Cir. 1999) ............................................ 55, 57

*United States v. Shirley*, 884 F.2d 1130 (9th Cir. 1989) ......................................... 59, 60

*United States v. Siders*, 712 Fed. App'x 601 (9th Cir. 2017) ........................................ 57

*United States v. Stapleton,* 293 F.3d 1111 (9th Cir. 2002) ...................................... 34, 35

*United States v. Stein*, 37 F.3d 1407 (9th Cir. 1994) .................................................... 41

*United States v. Stephens*, 779 F.2d 232 (5th Cir. 1985) .............................................. 60

*United States v. Swenson*, No. 1:13-CR-00091-BLW, 2014 WL 354702  (D. Idaho Jan. 31, 2014)

.................................................................................................................................. 52

*United States v. Taylor*, 808 F.3d 1202 (9th Cir. 2015)................................................. 43

*United States v. Testa*, 548 F.2d 847 (9th Cir. 1977).................................................... 48

*United States v. Thomas*, 586 F.2d 123 (9th Cir. 1978)................................................. 32

*United States v. Tille*, 729 F.2d 615 (9th Cir. 1984)..................................................... 49

*United States v. Traylor*, 656 F.2d 1326 (9th Cir. 1981)............................................... 32

*United States v. Turman*, 122 F.3d 1167 (9th Cir. 1997)............................................... 41

*United States v. Warren*, 25 F.3d 890 (9th Cir. 1994)................................................... 45

*United States v. Weiner*, 578 F.2d 757 (9th Cir. 1978).................................................. 48

*United States v. Wells*, 519 U.S. 482 (1997)................................................................. 43

**Government's Trial Brief**                                                    **Page 8**

*United States v. Williams*, 989 F.2d 1061 (9th Cir. 1993) ............................................................ 61

*United States v. Wiseman*, 25 F.3d 862 (9th Cir. 1994) ............................................................... 31

*United States v. Woods*, 335 F.3d 993 (9th Cir. 2003) ............................................................ 34, 35

*United States v. Workinger*, 90 F.3d 1409 (9th Cir. 1996) ...................................................... 54

*United States v. Yarborough*, 852 F.2d 1522 (9th Cir. 1988) .................................................. 49

*United States v. Zavada-Serra*, 853 F.2d 1512 (9th Cir. 1988), ............................................ 48

*United States v. Zemek*, 634 F.2d 1159, (9th Cir. 1980) ......................................................... 31

*Whitfield v. United States*, 543 U.S. 209 (2005) ...................................................................... 30

*Williamson v. United States*, 512 U.S. 594 (1994) .................................................................. 46

I.     <u>**STATUS OF THE CASE**</u>

On July 13, 2022, the grand jury returned a Superseding Indictment charging Defendants Robert J. Jesenik, Andrew N. MacRitchie, and Brian K. Rice (collectively "Defendants") with Conspiracy to Commit Mail and Wire Fraud in violation of 18 U.S.C. § 1349 (Count 1), Wire Fraud in violation of 18 U.S.C. § 1343 (Counts 2-29), and Conspiracy to Commit Money Laundering in violation of 18 U.S.C. § 1956(h) (Count 30).  Defendant Jesenik is also charged with making a False Statement on a Loan Application in violation of 18 U.S.C. §§ 2 and 1014 (Count 31).  (ECF No. 171.)

It is alleged that Defendants conspired to engage in a scheme to defraud investors and to launder the proceeds with each other and with coconspirators N. Scott Gillis, Brian Oliver and Olaf Janke.  Mr. Gillis is the former Chief Operating Officer and Chief Financial Officer of Aequitas.  He pleaded guilty to making a False Statement on a Loan Application in violation of 18 U.S.C. § 1014, for the same conduct Defendant Jesenik is charged with in Count 31.  (ECF Nos. 138, 139.)  Coconspirator Brian Oliver is a former Executive Vice President who pleaded guilty to conspiring to commit mail and wire fraud and money laundering.  *See United States v. Brian A. Oliver*, No. 3:19-cr-00132-MO (D. Or.), ECF Nos. 1 and 13.  Coconspirator Olaf Janke is the former Chief Financial Officer and an Executive Vice President who also pleaded guilty to conspiring to commit mail and wire fraud and money laundering.  *See United States v. Olaf Janke*, Case No. 3:19-CR-00237-SI (D. Or.), ECF Nos. 3, 12, 13.  Some or all of the coconspirators will testify at trial.

/ / /

/ / /

/ / /

**Government's Trial Brief**                                                                          **Page 10**

An approximately five-week jury trial is scheduled to begin on April 3, 2023.  The government expects to call approximately 45 witnesses[1] and to offer approximately 550 exhibits. The government requests leave to file amended witness and exhibit lists depending on stipulations, defense arguments, and pretrial rulings on the parties' motions *in limine* and objections to expert witnesses.  The government is seeking stipulations that may reduce the number of witnesses.

The government's anticipated witnesses include cooperating coconspirators who have pleaded guilty, former Aequitas employees and investors, registered investment advisers, bank employees, various records custodians, two expert witnesses, and a case agent.  Two government witnesses reside in Europe.  The government anticipates they will testify in person at trial.  If the witnesses' presence cannot be obtained, the government will confer with defense counsel and file a motion seeking to take their depositions before trial pursuant to Federal Rule of Criminal Procedure 15.

## II.    STATEMENT OF FACTS

In 2005, Jesenik created Aequitas Capital Management, Inc. ("ACM") from a predecessor investment banking firm he had cofounded.  In 2007, the company moved to Lake Oswego, Oregon, where it would aggressively expand until its spectacular collapse in March 2016.

Aequitas's expansion over the years yielded a complex network of companies, starting with the addition of Aequitas Holdings, LLC ("Holdings") and Aequitas Investment

---

[1] The government does not presently anticipate calling in its case-in-chief the following witnesses named in the Government's Witness List (ECF No. 273): Robert Baldwin, Eric Bernstein, Bruce Forman, Megan Hartley, Don Iverson, David Jackson, Carin Julsgard, William Malloy, Floriane Meyer, Todd Nelson, Ed Norris, Mani Rahnama, Nazanin Rahnama, Jared Rollins, Peter Schock, David Schuler, and Ed Texeria.

Management, LLC ("AIM"), and Aequitas Commercial Finance, LLC ("ACF") in 2006 and Aequitas Management ("AMLLC") in 2007.  By 2016, the sprawling array of Aequitas-affiliated companies, partnerships, and funds—collectively referred to as "Aequitas"—comprised dozens of entities tangled in a web of Byzantine complexity.  (Ex. 404.)

Aequitas aggressively added personnel as well, though Jesenik's protégé, Brian Oliver, was there from the start.  At its peak in 2015, the firm employed nearly 200 people.  In recruiting executives to help him manage the bourgeoning enterprise, Jesenik consistently sought out candidates with backgrounds at large, well-known companies.  Oliver had come from U.S. Bank. Defendant Andrew N. MacRitchie joined in 2006 after a stint at PacifiCorp.  Olaf Janke came on board in late 2011 after spending most of his career at Deutsche Bank.  Jesenik recruited Defendant Brian K. Rice in October 2014 from his post as a regional president for Key Bank. Jesenik coaxed Scott Gillis out of retirement to join Aequitas after a successful career culminating in a senior position at AIG.

AMLLC sat atop the Aequitas structure and served as the entity through which the individual partners owned and managed the enterprise.  Jesenik, Oliver, MacRitchie, and Janke were partners in AMLLC.  Through his control of AMLLC, Jesenik was entrenched as chief executive officer of Aequitas and exercised ultimate authority over nearly every aspect of the enterprise's operations.  By all accounts, he was a micromanager, as well as the company's principal pitchman.  Oliver was an executive vice president ("EVP") and oversaw Aequitas's direct fundraising—primarily from wealthy investors and family investment offices. MacRitchie, also an EVP, served as the firm's chief compliance officer until the summer of 2015, when he switched his focus to soliciting investments in Aequitas's new Luxembourg-based fund (the "Lux Bond").  For most of his tenure at Aequitas, MacRitchie oversaw its legal

and compliance functions.  Janke was an EVP and Aequitas's chief financial officer ("CFO")
from 2013 through January 2015.  Gillis served as the company's chief operating officer after
joining in January 2015 and succeeded Janke as the CFO.  Rice was an EVP and served as the
president of Aequitas Wealth Management, which invested in and managed relationships with a
network of registered investment advisers ("RIAs").

Aequitas engaged in diverse financial dealings, ranging from the ownership of a few
struggling businesses to the management of various investment funds.  By the time of the events
at issue in this case, Aequitas's primary business was borrowing money from investors and
institutional creditors for the purpose of buying consumer receivables, typically at substantial
discounts and with provisions for recourse to the original lenders.  Aequitas was meant to profit
from this business by collecting more on those receivables than it paid for them and collecting
interest and fees associated with servicing the loans.

At its height, Aequitas's inventory of receivables had a total fair value of more than $240
million.  (ECF No. 257-3 at 170.)  The largest pools of receivables Aequitas held were purchased
from various hospital networks, a consumer debt-consolidator named Freedom Financial
Network, a motorcycle lender named Motolease Financial, and one of the nation's largest
operators of for-profit technical and post-secondary schools: Corinthian Colleges ("Corinthian").

The student loans from Corinthian constituted by far the largest single category of
receivables Aequitas owned.  As of January 2014, when it stopped purchasing them, Aequitas
owned student loans with a face value of more than $200 million, representing an investment by
Aequitas of nearly $100 million.  Under the terms of their agreement, Aequitas was entitled to
recourse payments from Corinthian for its full investment in any student loan that fell more than

/ / /

**Government's Trial Brief**                                                                 **Page 13**

90 days in arrears.  This recourse agreement had historically yielded cash payments from Corinthian to Aequitas of more than $4 million per month.

<u>CORINTHIAN'S DEFAULT AND BEGINNING OF THE SCHEME TO DEFRAUD</u>

In early 2014, the U.S. Department of Education was scrutinizing Corinthian's graduation and job-placement rates.  The Department announced in June of that year that it would defer the payment of federal student-aid funds to Corinthian.  Corinthian soon afterward defaulted on its monthly recourse payment to Aequitas.  Corinthian's difficulties in June 2014 made the news, causing one Aequitas investor to email Janke to ask about the impact Corinthian's potential closure could have on the value of Aequitas's large inventory of student loans.  (Ex. 32.)  Other investors in ACF Private Note—Aequitas's primary fundraising vehicle—contacted Oliver and others at Aequitas, expressing similar concerns and seeking to redeem their investments.

On June 23, 2014, in hopes of forestalling a run on the company, Jesenik, Oliver, MacRitchie, and Janke prepared a letter from Jesenik to ACF Private Note investors, reassuring them that Corinthian's woes would not imperil their investments in Aequitas. (Ex. 35.)  Janke drafted the letter, explaining why Corinthian's default should not impair Aequitas's ability to recoup its investment from student borrowers.  He also claimed that borrowers' defaults on their student loans could even *increase* substantially in the absence of Corinthian's recourse payments without adversely affecting Aequitas's ability to pay the interest it owed Private Note investors:

> In effect, accounting for [our] cost of capital, the [student borrower] default rate could increase by as much as 7.5% without impacting Aequitas' ability to return the investment amount/cost basis after paying interest or preferred returns to Aequitas' investors.

Jesenik went further, inserting the following passage:

/ / /

**Government's Trial Brief**                                                                     **Page 14**

In summary, while this program has been a growing part of our portfolio within Aequitas Commercial Finance ("ACF"), our Private Note investors benefit from the performance of all of ACF's lending strategies from a collateral and cash flow perspective. Last year ACF generated roughly $57 MM in EBITDA to pay interest on Private Notes, and we expect that number will be greater in 2014 due to the growth of the firm overall.

Both of these statements were false. For years, Aequitas had not generated sufficient cash flow from operating revenue to pay its expenses and what it owed to creditors and investors. The loss of $4 million or so in cash coming from Corinthian every month immediately exacerbated already serious and persistent liquidity crunches at the firm. Any greater rate of defaults on student loans would only make the shortfalls worse.

<u>USE OF THE HOLDINGS NOTE TO CONCEAL LOSSES AND INDEBTEDNESS</u>

Aequitas's cash losses accumulated over the years in an intercompany line of credit from ACF, which did almost all of the fundraising and borrowing for Aequitas, to Holdings, which was the parent of all of Aequitas's funds and operating entities. The loan was typically referred to as the "Holdings Note." Holdings used advances on the Holdings Note to cover cash shortfalls—including those arising from payroll—wherever they arose in the enterprise.

The Holdings Note was created in October 2008 as a $25 million line of credit from ACF to Holdings, which merely formalized the transfer of nearly $21 million in investor money that ACF had already made to its parent. (Ex. 1.) The Holdings Note nearly doubled the next year, to $45 million. (Ex. 2.) Eighteen months later, it was raised again—to $60 million. (Ex. 5.) Fourteen months after that, it jumped to $80 million. (Ex. 10.) In the summer of 2013, the Aequitas partners—including Jesenik, Oliver, MacRitchie, and Janke—started tracking the balance of the Holdings Note and the shortfall in the collateral backing it. (Ex. 13.)

By the time Corinthian defaulted on its recourse payments the following June, the Holdings Note balance had ballooned to more than $90 million—leaving the credit line

**Government's Trial Brief**                                                                 **Page 15**

overdrawn by more than $10 million.  Its growth accelerated from there, hitting $125 million by the end of 2014.  (Ex. 399.)  In May 2015, the balance had grown to $165 million—overdrawn by more than 100 percent.  It was only then—while seeking to finalize a favorable opinion from ACF's outside auditors—that Gillis executed a sixth amendment to the Holdings Note, increasing the line of credit from $80 million to $175 million.  He backdated the amendment to January 14, 2014, to formalize the transfer of tens of millions of dollars that had been diverted from ACF to Holdings with no authorization whatsoever.  (Ex. 18.)  But that date was a year before he had joined the company.  Jesenik executed a revised (but still backdated) amendment soon thereafter.  (Ex. 19.)

At the end of June 2015, the balance on the Holdings Note had grown to nearly $150 million.  By Aequitas's own accounting, though, Holdings had only about $60 million in collateral backing its debt.  (Ex. 221.)  And even that figure was inflated, since Holdings' most valuable asset—constituting half its collateral—was yet another undercollateralized intercompany loan: from Holdings to its perennially money-losing subsidiary, ACM.

To Janke, the Holdings Note represented the sins of the past.  To Oliver, it was Aequitas's dirty little secret.  Though Aequitas routinely retained reputable accounting firms to audit its finances, Holdings was never audited.  Jesenik himself decreed that outside investors would "never" see Holdings' financials. (Ex. 14.)  Indeed, Aequitas declined to share any of its financials with any but its most significant potential investors.

Given the unrelenting cash losses at the firm and the cumulative losses sequestered in the Holdings Note, Aequitas was effectively insolvent by July 2014.  It needed more and more capital just to pay its expenses and the principal and interest it owed to its investors—who by then were owed $325 million in outstanding principal.  (Ex. 41.)  At that point, Aequitas had

effectively suspended net purchases of new receivables, which were the firm's only meaningful source of cash revenue.[2]  The total value of Aequitas's inventory of receivables had declined by more than $25 million in the first half of the year, even as the amount borrowed from investors had increased by about the same amount.  (Ex. 41.)  Within weeks of Corinthian's default on its recourse obligation, Janke was urging Jesenik to slash expenses and slow the pace of investments due to the lack of cash on hand. (Exs. 45–46.)

To get more cash in the door, Aequitas sought to borrow ever more from banks and other financial institutions.  Because of ACF's poor results, however, it could not obtain a general business line of credit.  Aequitas thus resorted to getting loans directly against the receivables it had purchased with investors' money.  During the Indictment period, Janke and Gillis set up large receivables-backed loans with Bank of America, Wells Fargo, and Comvest.

At the same time, Jesenik demanded that Oliver and the sales team ratchet up their fundraising from investors, with the overriding imperative of keeping current on payments to prior investors and covering Aequitas's outsized operating expenses.  Jesenik dismissed appeals from his subordinates—including Janke and Oliver and eventually MacRitchie and Rice—to curtail the firm's culture of lavish spending, most conspicuously on private jets and bloated headcount.  He would retort, "You can't shrink your way to greatness."  Jesenik spoke of Aequitas's one day rivaling the global titans of asset management firms, including Blackstone and Apollo Management.

/ / /

/ / /

---

[2] Aequitas consistently claimed to be profitable, but this was predicated entirely on marking up the value of its investment in CarePayment Technologies, which never generated a net operating profit.

<u>MISREPRESENTATIONS AND HALF-TRUTHS TO SOLICIT INVESTMENTS</u>

Because Aequitas did not generate positive cash flow, the only way it paid its bills was by borrowing—primarily from investors.  This was expensive.  Aequitas had to offer interest rates averaging more than 10% even as bank rates hovered near zero. In the wake of Corinthian's default, fundraising became even more urgent and expensive with Aequitas's offering short-term, high-interest promissory notes referred to internally as "blue light specials."

From June 1, 2014, until its collapse, Aequitas raised the vast majority of non-equity investments[3] through three funds: ACF Private Note, Income Opportunity Fund II ("IOF II"), and the "Lux Bond."  Jesenik, Oliver, MacRitchie, and Rice—as well as Aequitas personnel under their control—used various documents to solicit investments in these funds.  Private Note and IOF II were presented in Private Placement Memoranda ("PPMs"), and the Lux Bond was featured in a Prospectus. The PPMs were prepared by Tonkon Torp, LLC;  the Prospectus was prepared by Arendt & Medernach, a law firm in Luxembourg.  Private Note and IOF II also had two-page "tear sheets" that were prepared and updated every quarter by the Aequitas marketing team and used as the primary means of marketing those funds.

All of these marketing materials were approved by Jesenik, and most of them were approved by MacRitchie as Aequitas's chief compliance officer and lead for the Lux Bond offering.  The documents consistently misrepresented how Aequitas would use investors' money, indicating that it would be spent to purchase receivables when instead it was routinely diverted to pay Aequitas's bills and prior investors.

/ / /

/ / /

---

[3] Aequitas also raised more than $50 million through equity funds, but that fundraising activity is not at issue in this case.

**Government's Trial Brief**                                                                 **Page 18**

*ACF Private Note*

The ACF Private Note was Aequitas's largest fundraising vehicle. Of approximately $250 million raised in various Aequitas funds during the Indictment period, nearly $167 million was raised through Private Note—including through the "blue light specials" offered in the summer of 2014. From December 2013 through November 2015, the Private Note investment was memorialized in a PPM dated November 30, 2013. The PPM was approved by Jesenik and MacRitchie. (Exs. 15–16.) Tonkon Torp updated the PPM in October 2014, and investors making Private Note investments thereafter received the 2013 PPM with the 2014 Supplement, but the relevant provisions of the 2013 PPM remained unchanged. (Ex. 497.)

The Private Note PPM billed the investment as a "secured subordinated note offering" that was secured by all the personal property of ACF. It indicated primarily that proceeds from investments would be used to "to engage in various specialty financing transactions," including the purchase of "student loan receivables," "patient-pay receivables," "receivables and loan portfolios," and "other debt transactions and equity investments in third party private credit strategies and companies." It also indicated that funds would be used to "to provide lines of credit for the benefit of [ACF's] affiliates and its related investment program and to repay previously issued Secured Notes," but the PPM offered the following qualification:

> The Company generally pays the principal and interest of Secured Notes from the proceeds from repayments of loans, leases, subordinated debt investments and similar assets of the Company and sales of Company assets. *From time to time, the Company may use proceeds of the sale of Secured Notes to repay the principal and interest of previously issued Secured Notes due principally to the illiquid nature of many of the Company's investments* and to the Company's ongoing efforts to reduce its weighted average cost of capital by, in part, replacing Secured Notes bearing higher interest rates with Secured Notes bearing lower interest rates.

/ / /

**Government's Trial Brief**                                                                                    **Page 19**

The indication that the proceeds of Private Note investments would be used to pay prior investors' principal and interest only "from time to time" was false.  So was the implication that Private Note proceeds were principally used "to engage in specialty financing transactions," such as the purchases of student loans and healthcare receivables.  Throughout the time period the 2013/2014 PPM was used, most Private Note money went to defraying Aequitas's expenses and paying off prior investors.  Almost none went to purchasing student loans or healthcare receivables during the Indictment period.

The Private Note tear sheets featured similar language about the uses of investors' money, but they also made misrepresentations about the assets that backed Private Note investments.  Most notably, the tear sheets that investors saw before October 2015 disguised the Holdings Note—ACF's largest putative asset—as "corporate debt," falsely suggesting arms-length investments in corporate bonds rather than an IOU from Aequitas to itself.  (Exs. 52, 71.) The tear sheets also substantially overstated the value of the assets backing Private Note investments by concealing the overwhelming extent to which they were already pledged to banks and senior note investors.

Defendants did not rely solely on documents to solicit investments in the ACF Private Note. They also gave face-to-face and telephonic sales pitches.  Jesenik himself raised millions of dollars in Private Note investments during the Indictment period.  In his pitches, Jesenik consistently characterized Private Note investments as going toward Aequitas's purchase of receivables—particularly healthcare receivables.  Even when a significant Private Note investor asked whether his money would be used to pay back other investors, Jesenik falsely denied it. Jesenik invariably characterized Aequitas's performance in glowing terms.

/ / /

**Government's Trial Brief**                                                                 **Page 20**

Rice also gave potential Private Note investors and their RIAs misleading information about how their investments would be used.  In late September 2015, ACF was facing a serious liquidity crisis with millions in redemptions and quarter-end interest payments coming due. Knowing the money would go to making those payments, Rice solicited $10 million in Private Note investments by offering more "blue light specials" through an RIA in Seattle.  Rice indicated to the RIA that Aequitas urgently needed the money to fund time-sensitive purchases of receivables.  (Ex. 238.)  The RIA duly forwarded the information to his clients. (Ex. 240.) The clients invested—electronic notice of the incoming wires are charged as counts 7 and 8— and Aequitas promptly used their money to pay off prior investors with wires charged in counts 9 through 12.

*IOF II and the Lux Bond*

The other two funds through which Aequitas raised most of its investor debt during the Indictment period were IOF II and the Lux Bond.  IOF II was launched in October 2014, and the Lux Bond was launched in July 2015.  Both funds purported to be more narrowly focused and tied to specific receivables, in contrast to the "subordinated" ACF Private Note, but Defendants intended that the money raised through these vehicles would be used just as Private Note investments were used: to pay Aequitas's prior investors and the bills Aequitas most urgently needed to pay.

The PPM for IOF II described investments in that fund as "senior secured promissory notes." (Ex. 68.)  It repeatedly assured investors that their money would be "use[d] to acquire portfolios of Credit Strategy Receivables" in which IOF II—and by extension its investors— would retain a senior security interest.  Aequitas also offered IOF II notes through Integrity Bank and Trust, which promised investors the ability to redeem their investments on a quarterly basis.

**Government's Trial Brief**                                                                      **Page 21**

(Ex. 61.) IOF II thus purported to offer investors greater security and liquidity than the ACF Private Note (which typically required lock-up periods of at least one year).

Aequitas ultimately raised nearly $68 million from investors in IOF II during the charged scheme to defraud, but the fund used almost none of it to purchase receivables or any other income-generating assets. Indeed, from its inception, investor money at IOF II was consistently and overwhelmingly swept to ACF to defray operating expenses and payments of principal and interest to prior Aequitas investors.

Aequitas created a "note manufacturing" process to assign equity in pre-existing inventories of receivables to IOF II rather than purchasing new receivables for the fund. This process was used to justify the routine diversion of investments from IOF II to whatever use the money was actually put. Even that pretense was sustainable for only a few months, however, before Aequitas's equity in existing inventories of receivables was largely exhausted. By the summer of 2015, Aequitas was diverting money from IOF II without any semblance of security transferred to IOF II investors.

The Lux Bond was Aequitas's effort to raise money from the European market. MacRitchie oversaw this project and relocated from Aequitas's Lake Oswego office to its newly opened satellite office in New York City in the spring of 2015. He and Jesenik worked with European representatives to solicit investments. According to the July 23, 2015, Prospectus for the Lux Bond, "proceeds of . . . investments w[ould] be used by Aequitas to acquire pools of Credit Strategy Receivables," specifically, debt-consolidation loans acquired from Freedom Financial Network. En route to their destination, the Lux Bond proceeds would pass through an intermediate offshore entity, a Cayman Islands partnership called Aequitas International Opportunities LP ("AIO"). (EX 196.)

**Government's Trial Brief**                                                      **Page 22**

But that wasn't the whole story.  Defendants also planned to borrow substantial portions of the Lux Bond proceeds, as necessary, to keep Aequitas afloat.  To that end, MacRitchie invoked a provision inserted into AIO's July 28, 2015, partnership agreement authorizing AIO to "lend funds to [Aequitas] on a temporary basis until such funds are required for other Investments."  (Ex. 197, 199.)  The Lux Bond investors never received the AIO partnership agreement, however, and were never told that AIO would lend their money to Aequitas.  As the primary pitchman for the Lux Bond, MacRitchie knew this, but he and Jesenik nevertheless personally authorized repeated "loans" from AIO to Aequitas.  These included a $4 million transfer on July 31, 2015 (Exs. 200-01) and a $3 million wire transfer on October 15, 2015, which is charged in Count 13 of the Superseding Indictment (Ex. 292).

*Loans from Financial Institutions and Senior Lenders*

Almost all of the receivables Aequitas purchased during the Indictment period were actually financed with bank credit and funds raised from "direct note" investors, who gave Aequitas money in exchange for security interests in specific pools of receivables—primarily healthcare receivables.

At Jesenik's direction, Janke negotiated loan agreements to finance healthcare receivables with Bank of America, starting in 2014, and Wells Fargo, starting in 2015.  Under these agreements, the banks funded approximately 85% of healthcare receivables Aequitas acquired during the Indictment period.  Almost all of the remainder was financed by "direct note" investors.

The banks' finance agreements required Aequitas, when drawing on the respective lines of credit, to certify the existence of certain conditions.  With respect to Wells Fargo, these conditions included that ACF had not defaulted on payments due to any other creditors on loans

worth more than $2.5 million in total outstanding principal.  By January 11, 2016, Defendants

knew that ACF was in default on more than $2.8 million in Private Note redemptions (almost all

of which had gone unpaid since the beginning of November 2015 for lack of cash).  Aequitas's

general counsel, Bob Holmen (who had joined the firm in June 2015), accordingly advised

Defendants to cease borrowing on both bank lines of credit.

Despite that advice, Jesenik directed Gillis, the CFO, to certify there was no such default

on January 15, 2016, in order to draw $4.2 million on the Wells Fargo line.  This cash was

urgently needed to pay interest to Aequitas investors.  Gillis duly made the false certification,

which is the basis for the charge against Jesenik in Count 31 of the Superseding Indictment.

Gillis pleaded guilty to the same charge in a separately filed information on May 26, 2022.

<u>DEFENDANTS' KNOWLEDGE OF THE FRAUD</u>

Throughout the scheme to defraud, Defendants received extensive warnings about the

firm's precarious financial situation and the routine diversion of investor money.  Jesenik,

Oliver, Gillis, and Rice routinely received "cash dash" emails circulated by Janke or Aequitas

treasury personnel.  The email notifications typically laid out the anticipated total needs for cash

in excess of operational revenue over the upcoming weeks as well as the cash anticipated from

bank borrowing and investor fundraising. When there were shortfalls—as there usually were in

the latter half of 2014 and throughout 2015—the emails would often list the pending obligations

to investors and sellers of receivables as well as operational expenses such as payroll.  Jesenik

routinely decided which obligations would go unmet when shortfalls could not be remedied by

last-minute infusions of investor cash.

After Corinthian's default, Janke repeatedly used the occasion of the "cash dash" emails

to warn Jesenik about the urgent need to slash expenses, sell appreciated assets (such as the

firm's stake in CarePayment Technologies), and slow deployment of capital in new investments in order to create a cash cushion that could alleviate the constant liquidity crises.  While Jesenik signaled his agreement with creating a cash cushion, he resisted efforts to make it happen.

In addition to the "cash dash" emails, the top management of Aequitas (which included Defendants) tracked the firm's performance at AMLLC (partnership) meetings.  In August and September 2014, the management reviewed Aequitas's financials for the first half of the year. The results were disastrous.  Janke once again pressed for action to slash expenses, but to no avail.  He announced his decision to resign the following month.  In order to keep Janke on board until the following April and prevent him from departing in the middle of Aequitas's 2014 audit, Jesenik negotiated a bonus and buy-out of Janke's partnership for a total of approximately $1.8 million (plus the cancelation of amounts Janke still owed for the equity). (Ex. 84.)

As Aequitas's financial situation continued to deteriorate through 2015, Oliver expressed increasingly urgent concerns about the direction of the company.  He sent emails to Defendants (often individually), emphasizing the downward trajectory of the balance sheet and the corresponding challenges in soliciting new investments.

In the spring of 2015, the Securities and Exchange Commission ("SEC") initiated an investigation into ACF's operations.  As chief of compliance, MacRitchie was the lead in responding to the SEC's requests for information.

In June 2015, Bob Holmen joined Aequitas as general counsel.  He took over the handling of the SEC investigation and, later that summer, MacRitchie's entire compliance portfolio.  By August 2015, Holmen appreciated the extent to which Aequitas investors were being misled about the uses of their money and the inaccuracies in the marketing documents for ACF Private Note.  He initiated a series of changes to the ACF Private Note and IOF II PPMs

and tear sheets the following month.  On September 1, 2015, Holmen advised Jesenik and

MacRitchie that the uses of IOF II money to pay Private Note investors was tantamount to a

Ponzi scheme.  Holmen similarly objected in October to the second loan of Lux Bond proceeds

from AIO to ACF, but Jesenik and MacRitchie authorized it anyway.

    Jeff Mazer joined Aequitas in May 2015 as senior director of capital markets and

treasury.  Gillis recruited him to look for additional avenues for borrowing from financial

institutions (thereby reducing Aequitas's reliance on fundraising from investors), but he quickly

realized Aequitas's financial position would make that impossible.  By the late summer of 2015,

Mazer and Holmen were frequently comparing notes on the financial and compliance issues at

Aequitas.  As part of reforms they advocated, Jesenik appointed Mazer the fund manager of IOF

II in September.  Over the ensuing weeks, Mazer objected to the diversion of IOF II investment

proceeds in exchange for inadequate security interests.  He also opposed a $3 million transfer of

Lux Bond proceeds to ACF.  After Jesenik, MacRitchie, and Gillis overruled the latter objection

in October, Mazer prepared a memorandum detailing his concerns with compliance at Aequitas.

He distributed it to Jesenik, MacRitchie, Gillis, and Holmen on October 19, 2015.  (Ex. 299.)

The memorandum was the subject of discussion among Defendants at AMLLC meetings on

October 30 and November 9.  (Exs. 316, 328.)

    Holmen shared the Mazer memorandum with Tonkon Torp the same day.  Tonkon

resigned as securities counsel to Aequitas three days later.  Holmen also shared the Mazer

memorandum with Aequitas's lawyers for the SEC investigation at Sidley Austin.  Sidley

advised that it should be disclosed to the SEC.

    At the end of October 2015, Holmen met with Defendants and discussed the need to close

down ACF.  Two weeks later, Holmen circulated a memorandum to Defendants with specific

recommendations for restructuring ACF and curtailing its lending to affiliated entities (*i.e.*, advances on the Holdings Note).  (Ex. 523.)  Notwithstanding these recommendations, defendants continued to solicit money from investors for ACF Private Note and IOF II as they had before.  Incoming wires of investor proceeds after that date are charged as counts 19–21, 24–25, and 27–28 of the Superseding Indictment.[4]  They also continued to borrow against ACF's lines of credit, including the Wells Fargo advance charged in count 31.

Meanwhile, Rice was falsely representing to investors that the suspension of routine Private Note redemptions starting in November was merely "due to some unexpected delays in incoming investments and related timing mismatches on our cash flows." (Ex. 392.)  One such misrepresentation, which Rice caused to be sent on December 30, 2015, is charged in count 29.

<u>COLLAPSE AND APPOINTMENT OF RECEIVER</u>

By the end of January 2016, it was clear that Aequitas was in a death spiral.  The widespread default on ACF Private Note redemptions that month triggered calls from RIAs and investors, but Defendants had no satisfactory information to give them.  Several investors indicated that Jesenik had to go.  The SEC had suggested to Holmen that Aequitas could expect to be sued.

In February, Aequitas engaged a team from FTI Consulting to assist with a wind down of the firm and rescue of any salvageable assets.  The FTI team was helmed by Ronald Greenspan and included Bradley Foster, a CPA and FTI managing director with 35 years of experience in debt and equity financing.  The wind-down plan was soon overtaken by events.  On March 10, 2016, the SEC filed its lawsuit against Aequitas and sought imposition of a receivership.  By

---

[4] Counts 22 and 26 charge uses of the wires to divert incoming investor money to make a referral payment to an RIA and to pay off a prior Private Note investor, respectively.

**Government's Trial Brief**                                                                 **Page 27**

stipulation, the court appointed Greenspan to serve as the Receiver.  Greenspan immediately

terminated Jesenik for cause and later, with Foster's assistance, conducted a forensic

investigation of Aequitas's finances.  Foster drafted a forensic report, which was filed in this

matter as his expert witness report.  (ECF No. 257-3.)

       As a result of the forensic investigation, the Receiver and Foster concluded that Aequitas

had been insolvent since at least July 3, 2014.  The Receiver and Foster also noted a number of

"badges of fraud" and operations that reflected Ponzi-like financing at Aequitas.  These included

the wholesale commingling of investors' funds without regard to their source or intended

purpose, offering extraordinary rates of return despite consistent unprofitability, and using new

investor money to pay returns to prior investors.

       Foster also calculated the scale to which Defendants had enriched themselves—inevitably

with investors' money—during the Indictment period, which roughly tracks Aequitas's

insolvency.  According to Foster's  calculations, Jesenik took more than $1.8 million in direct

compensation and allowed expenses; MacRitchie took more than $900,000, and Rice took more

than $500,000.  In addition, Jesenik and MacRitchie approved Janke's bonus of $500,000 and

equity buyout for another $1.3 million in the early months of 2015, and Oliver took another

$780,000 in compensation.  (ECF No. 257-7.)  Defendants' agreement to divert investor money

to pay for these salaries and their accompanying perquisites (which included extravagant

vacation rentals and fancy cars) is the subject of the money laundering conspiracy charged as

count 30.

## III.    ELEMENTS OF THE OFFENSES AND LEGAL ISSUES

       As previously noted, Defendants are charged with conspiracy to commit mail and wire

fraud, numerous substantive counts of wire fraud, and conspiracy to commit money laundering.

Defendant Jesenik is additionally charged with aiding and abetting the making of a false statement on a loan application. The elements for each crime are discussed below, and the government will contemporaneously file proposed jury instructions related to each offense.

### A.    Conspiracy to Commit Mail and Wire Fraud (Count 1)

In Count 1 of the Superseding Indictment, Defendants are charged with conspiring to commit mail and wire fraud in violation of 18 U.S.C. § 1349. To establish that crime, the government must prove (1) that Defendants and other coconspirators agreed to commit wire or mail fraud and (2) that the Defendants became a member of the alleged conspiracy knowing one of its objects and intending to help accomplish it. *United States v. Holmes*, No. 5:18-CR-00258-EJD-1, 2022 WL 4086525, at *1 (N.D. Cal. Sept. 6, 2022). The Superseding Indictment alleges the manner and means by which Defendants and their coconspirators carried out the conspiracy and scheme to defraud.

Conspiracy to commit wire or mail fraud under 18 U.S.C. § 1349 does not require proof of an overt act, unlike the general conspiracy statute, 18 U.S.C. § 371, which does. *United States v. Hussain*, No. 16-CR-00462-CRB, 2018 WL 3619797, at *34 (N.D. Cal. July 30, 2018), aff'd, 972 F.3d 1138 (9th Cir. 2020) and 818 F. App'x 765 (9th Cir. 2020). While the Ninth Circuit has not yet weighed in on the issue, a number of other courts have applied the plain meaning rule to hold that § 1349 does not require an overt act. *Id. (citing United States v. Roy*, 783 F.3d 418, 420 (2d Cir. 2015); *United States v. Pascacio-Rodriguez*, 749 F.3d 353, 363, 364 n.49 (5th Cir. 2014); *United States v. Rogers*, 769 F.3d 372, 380–82 (6th Cir. 2014); *United States v. Fishman*, 645 F.3d 1175, 1186 (10th Cir. 2011); *United States v. Eason*, 579 Fed. App'x. 807, 810 n.3 (11th Cir. 2014) (unpublished); *United States v. Chinasa*, 489 Fed. App'x. 682, 685–86 (4th Cir. 2012) (unpublished). When construing other conspiracy statutes that do not explicitly state that

**Government's Trial Brief**                                                                                    **Page 29**

proof of an overt act is an element, the Supreme Court has held that their plain language demonstrates that an overt act is not an element. *See Whitfield v. United States*, 543 U.S. 209, 214 (2005) (construing 18 U.S.C. § 1956(h)). In *Whitfield*, the Supreme Court explained, "Congress has included an express overt-act requirement in at least 22 other current conspiracy statutes, clearly demonstrating that it knows how to impose such a requirement when it wishes to do so." 543 U.S. at 216.

### 1. The Agreement

"The agreement need not be explicit; it is sufficient if the conspirators knew or had reason to know of the scope of the conspiracy and that their own benefits depended on the success of the venture." *United States v. Montgomery*, 384 F.3d 1050, 1062 (9th Cir. 2004) (citing *United States v. Romero,* 282 F.3d 683, 687 (9th Cir. 2002)). Conspiracy to commit a crime "does not require completion of the intended underlying offense." *United States v. Iribe*, 564 F.3d 1155, 1160-61 (9th Cir. 2009).

To prove an agreement to commit a crime, it is not sufficient for the government to prove that the defendant committed the crime in question. It must prove that the defendant agreed with at least one other person to commit that crime. *United States v. Loveland*, 825 F.3d 555 (9th Cir. 2016). "An agreement to commit a crime can be explicit or tacit, and can be proved by direct or circumstantial evidence, including inferences from circumstantial evidence." *United States v. Kaplan*, 836 F.3d 1199, 1212 (9th Cir. 2016) (quotation marks and citation omitted). *See also United States v. Gonzalez*, 906 F.3d 784, 792 (9th Cir. 2018) (noting that tacit agreement is sufficient for conspiracy conviction). "A tacit agreement may be inferred from the conspirators' conduct as well as other circumstantial evidence," such as "a common motive, joint action in pursuit of a common objective, and a coordinated cover-up." *Gonzalez*, 906 F.3d at 792.

**Government's Trial Brief**                                                                 **Page 30**

## 2.   Knowledge of and Association with Other Conspirators

In order to support a conspiracy conviction, the person charged as a coconspirator must have knowledge of the conspiracy and have acted in furtherance.  *United States v. Wiseman*, 25 F.3d 862, 865 (9th Cir. 1994); *United States v. Zemek*, 634 F.2d 1159, 1170-71 (9th Cir. 1980). Mere casual association with conspiring people is not enough.  *Wiseman*, 25 F.3d at 865. "Knowledge of the objective of the conspiracy is an essential element."  *United States v. Rizk*, 660 F.3d 1125, 1134 (9th Cir. 2011) (citing *United States v. Krasovich*, 819 F.2d 253, 255 (9th Cir. 1987)); *United States v. Grasso*, 724 F.3d 1077, 1086 (9th Cir. 2013).

A person may be a member of a conspiracy even though the person does not know all of the purposes of or participants in the conspiracy.  *United States v. Escalante*, 637 F.2d 1197, 1200 (9th Cir. 1980); *United States v. Kearney*, 560 F.2d 1358, 1362 (9th Cir. 1977).  A defendant's knowing participation in the conspiracy can be proved by circumstantial evidence and inferences drawn from that evidence.  *Rizk*, 660 F.3d at 1134, (citation omitted); *Grasso*, 724 F.3d at 1086; *United States v. Bibbero*, 749 F.2d 588 (9th Cir. 1984).  Proof that the defendant knew he was plotting in concert with others to violate the law is sufficient to raise the necessary inference that he joined the overall agreement. *Id.*  "Once the existence of a conspiracy is shown, evidence establishing beyond a reasonable doubt a knowing connection of the defendant with the conspiracy, even though the connection is slight, is sufficient to convict him of knowing participation in the conspiracy." *United States v. Meyers*, 847 F.2d 1408, 1413 (9th Cir. 1988); *see also United States v. Olano*, 62 F.3d 1180, 1194 (9th Cir. 1995).  A defendant may have a "slight connection" to a conspiracy even if he did not know all the conspirators, did not participate in it from the beginning, or participate in all its enterprises, or otherwise know all its details.  *See United States v. Reed*, 575 F.3d 900, 924 (9th Cir. 2009).

**Government's Trial Brief**                                                                 **Page 31**

A single conspiracy can be established even though it took place during a long period of time during which new members joined and old members dropped out. *United States v. Green*, 523 F.2d 229, 233 (2d Cir. 1975). *See also United States v. Perry*, 550 F.2d 524, 528 (9th Cir. 1997) (holding that law of conspiracy does not require government "to prove that all of the defendants met together at the same time and ratified the illegal scheme"); *United States v. Thomas*, 586 F.2d 123, 132 (9th Cir. 1978) (holding that proof that defendant "knew he was plotting in concert with others to violate the law was sufficient to raise the necessary inference that he joined in the overall agreement"). A person may join a conspiracy that has already been formed and is in existence. *United States v. Traylor*, 656 F.2d 1326, 1337 (9th Cir. 1981) (citations omitted). The new conspirator is bound by all prior acts of co-conspirators taken in furtherance of the conspiracy. *Id*.

To prove a conspiracy "the evidence must show that 'each defendant knew, or had reason to know, that his benefits were probably dependent on the success of the entire operation.'" *United States v. Duran*, 189 F.3d 1071, 1080 (9th Cir. 1999) (quoting *United States v. Kearney*, 560 F.2d 1358, 1362 (9th Cir. 1977)).

### 3.  *Pinkerton* Liability

The *Pinkerton* doctrine provides that as long as the partnership in crime continues, the partners act for each other in carrying it forward. *United States v. Pinkerton*, 328 U.S. 640, 646 (1946). *Pinkerton* held that a defendant could be held liable for a substantive offense committed by a coconspirator as long as the offense occurred within the course of the conspiracy, was within the scope of the agreement, and could reasonably have been foreseen as a necessary or natural consequence of the unlawful agreement. *United States v. Alvarez-Valenzuela*, 231 F.3d 1198, 1202 (9th Cir. 2000); *United States v. Henry*, 984 F.3d 1343, 1355-1356 (9th Cir. 2021).

In *Grasso*, the defendant was convicted of conspiracy to commit bank fraud, loan fraud (making false statements to a federally insured financial institution), bank fraud, aiding and abetting, and money laundering. *Grasso*, 724 F.3d at 1077. The charges stemmed from several real estate transactions that defendant had engaged in with multiple codefendants. On appeal, the defendant claimed that there was insufficient evidence to convict him of certain loan fraud charges because he never made any false statements to federally insured institutions in these particular transactions. The Ninth Circuit disagreed, finding that under a *Pinkerton* theory, "coconspirators are liable for the reasonably foreseeable overt acts committed in furtherance of the conspiracy they joined, whether they were aware of them or not." *Id*. at 1089. While noting that there are due process limits to *Pinkerton* liability for defendants who have extremely minor roles in a conspiracy, such was not the case with the defendant. *Id*.

The evidence here will show that, as part of the conspiracy, Defendants and others engaged in multiple acts of wire fraud, including those charged in Counts 2 through 29 of the Superseding Indictment. The government will propose use of Ninth Circuit Model Criminal Jury Instruction 11.6 regarding Defendants' liability for those offenses.

### B.    Wire Fraud (Counts 2 through 29)

Defendants are charged in Counts 2 through 29 with wire fraud, in violation of 18 U.S.C. § 1343.

#### 1. Elements

For wire fraud, the government must prove the following four elements:

First, the defendant knowingly participated in, devised or intended to devise a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or

fraudulent pretenses, representations, or promises.  Deceitful statements of half-truths may constitute false or fraudulent representations;

Second, the statements made as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

Third, the defendant acted with the intent to defraud, that is, the intent to deceive and cheat; and

Fourth, the defendant used, or caused to be used, an interstate or foreign wire communication to carry out or attempt to carry out an essential part of the scheme. *See 9th Cir. Crim. Jury Instr.* 15.35 (2022); *see also United States v. Jinian*, 725 F.3d 954, 960 (9th Cir. 2013).

### 2.  The Scheme to Defraud

The term "scheme" includes "any plan, pattern or cause of action, including false and fraudulent pretenses and misrepresentations, intended to deceive others in order to obtain something of value, such as money, from the institution to be deceived." *United States v. Oplinger*, 150 F.3d 1061, 1065 n.2 (9th Cir. 1998); *see also United States v. Cloud*, 872 F.2d 846, 850 (9th Cir. 1989).  Each individual component of the scheme need not be illegal, so long as the scheme as a whole involves fraud.  *United States v. Rogers*, 321 F.3d 1226, 1229 (9th Cir. 2003).

In order to establish a scheme to defraud, the government need not prove that any particular false statement was made, but merely the existence of a scheme reasonably calculated to deceive.  *United States v. Woods*, 335 F.3d 993, 997–98 (9th Cir. 2003).  The defendant need not perform every act himself.  *United States v. Stapleton,* 293 F.3d 1111, 1116-1117 (9th Cir.

2002).  In addition, the Ninth Circuit has concluded that omissions of material facts, including through half-truths, may be used to establish a scheme to defraud.  *See, e.g.*, *Woods*, 335 F.3d at 997-98, 1000 (affirming convictions for mail fraud where the court had instructed the jury that "the statements made or the facts omitted as part of the scheme were material"); *see also Montgomery*, 384 F.3d at 1063-64 (affirming a conviction for mail fraud for a defendant who ran a property management business and who "took measures to limit the information contained" in the owners' statements she mailed to her victims, as these omissions furthered the ongoing scheme to defraud by avoiding inquiries from the owners).

Like coconspirators, knowing participants in a scheme to defraud are vicariously liable for their co-schemer's use of wires and other actions during the course of and in furtherance of the scheme, even if the defendant did not know what the other co-schemers said or did.  *See 9th Cir. Crim. Jury Instr.* 15.33 (2022).  For the defendant to be guilty of an offense committed by a co-schemer in furtherance of the scheme, the offense must be one that the defendant could reasonably foresee as a necessary and natural consequence of the scheme to defraud.  *Id.; see also Stapleton*, 293 F.3d at 1115-18  (holding that there was no error of law in court's instruction on elements of co-schemer vicarious liability when court also correctly instructed on scheme to defraud); *United States v. Blitz*, 151 F.3d 1002, 1006 (9th Cir. 1998) (stating that knowing participant in scheme to defraud is liable for fraudulent acts of co-schemers); *United States v. Lothian*, 976 F.2d 1257, 1262-63 (9th Cir. 1992) (discussing similarity of co-conspirator and co-schemer liability).

### 3.  Materiality

To prove wire fraud, the government must also prove that defendant's scheme to defraud or false statements and representations were material.  *Neder v. United States*, 527 U.S. 1, 20-25

(1999).  "A false promise, statement or representation is material if it is made to induce action or reliance by another or has a natural tendency to influence or is . . . capable of influencing another's decision."  *United States v. LeVeque*, 283 F.3d 1098, 1103-04 (9th Cir. 2002) (quoting *United States v. Halbert*, 712 F.2d 388, 390 (9th Cir. 1983)) (internal quotation omitted). Materiality of statements or promises must be established, *United States v. Halbert*, 640 F.2d 1000, 1007 (9th Cir. 1981), but the jury need not unanimously agree that a specific material false statement was made.  *United States v. Lyons*, 472 F.3d 1055, 1068 (9th Cir. 2007).  Moreover, the Government need not prove that victims relied upon the defendant's misrepresentations or that the victim suffered damages.  *Neder,* 527 U.S. at 25 (the common-law fraud elements of "justifiable reliance" and "damages" have no place in the federal fraud statutes).

The element of materiality is evaluated under an objective test, in which the jury must examine "the intrinsic capabilities of the false statement itself, rather than the possibility of the actual attainment of its end."  *United States v. Peterson*, 538 F.3d 1064, 1072 (9th Cir. 2008). "[T]he government does not have to prove actual reliance upon the defendant's misrepresentations" to satisfy materiality.  *Neder*, 527 U.S. at 25 (quotations and citations omitted).  The government has exhaustively briefed the objective materiality standard in various motions *in limine* and responses, and incorporates and relies on those arguments here.  (ECF No. 325 at 27-31; ECF No. 347 at 7.)

Materiality is a question of fact for the jury.  *United States v. Carpenter*, 95 F.3d 773, 776 (9th Cir. 1996).  The common law test for materiality in the false statement statutes, as reflected in the second element of the Ninth Circuit's Model Jury Instruction, is the preferred formulation. *United States v. Peterson*, 538 F.3d 1064, 1072 (9th Cir. 2008).  In this case, Defendants' material misrepresentation include, among other things, misrepresentations about the intended

uses of investors' funds and the extent and nature of the collateral backing their investments. Also, the jury will learn that Defendants and their coconspirators told investors that Aequitas was in a financially positive position when, in fact, they knew the company at the time had been suffering continuous and significant losses. They knew those losses were disguised in Aequitas marketing materials, which characterized the Holdings Note in a misleading manner.

### 4.  The Intent to "Deceive and Cheat"

The government must prove Defendants acted with the intent to defraud, that is, the intent to deceive and cheat. *9th Cir. Crim. Jury Instr.* 15.35 (2022). In *United States v. Miller*, 953 F.3d 1095, 1101-03 (9th Cir. 2020), the Ninth Circuit held that wire fraud requires the intent to "deceive *and* cheat," thereby overruling prior holdings approving the "deceive *or* cheat" language in light of the Supreme Court's decision in *Shaw v. United States*, 137 S. Ct. 462, 469 (2016). *Miller*, 953 F.3d at 1102. *Miller* reasoned that "to be guilty of wire fraud, a defendant must act with the intent not only to make false statements or utilize other forms of deception, but also to deprive a victim of money or property by means of those deceptions. In other words, a defendant must intend to deceive *and* cheat." *Id.* at 1101. A defendant acts with the intent to *deceive* when he "make[s] false statements or utilize[s] other forms of deception[.]" *Miller*, 953 F.3d at 1101. A defendant acts with the intent to *cheat* when he engages in "a scheme or artifice to defraud or obtain money or property" and "deprive[s] a victim of money or property" thereby "cheat[ing] someone out of something valuable." *Id.*

*Miller* does not disturb *Holden*'s ruling that although the mail and wire fraud statutes expressly punish only those who "devise . . . or intend . . . to devise" a fraudulent scheme, those who "participate in" such a scheme also fall within the statute's ambit. *United States v. Holden*, 908 F.3d 395, 399-401 (9th Cir. 2018), *as amended on denial of reh'g* (9th Cir. 2018). *Miller*

**Government's Trial Brief**                                                                 **Page 37**

also left unchanged the precedent that intent to repay "is not a defense to wire fraud." *Miller*,
953. F.3d at 1103.

### 5.  Use of Wires in Interstate Commerce

The government must prove that the defendant used, or caused to be used, an interstate
wire communication to carry out or attempt to carry out an essential part of the scheme. *9th Cir.
Crim. Jury Instr.* 15.35 (2022).  A wiring is caused when one knows that a wire will be used in
the ordinary course of business or when one can reasonably foresee such use. *Id.* (*comment*).  It
need not have been reasonably foreseeable to the defendant that the wire communication would
be interstate in nature.  Rather, it must have been reasonably foreseeable to the defendant that
some wire communication would occur in furtherance of the scheme, and an interstate wire
communication must have actually occurred in furtherance of the scheme. *Id.*

"One 'causes' use of . . . wire communications where such use can reasonably be
foreseen, even though not specifically intended."  *United States v. Cusino,* 694 F.2d 185, 188
(9th Cir.1982).  A wire communication is "in furtherance" of a fraudulent scheme if it is
"incident to the execution of the scheme," *United States v. Lo,* 231 F.3d 471, 478 (9th Cir. 2000),
meaning that it "need not be an essential element of the scheme, just a 'step in the plot.'" *United
States v. Garlick,* 240 F.3d 789, 795 (9th Cir. 2001) (quoting *Schmuck v. United States,* 489 U.S.
705, 711, 109 S. Ct. 1443, 103 L.Ed.2d 734 (1989)).

A defendant may be found guilty of causing the use of interstate wires in furtherance of a
fraudulent scheme even if he has no actual knowledge or intent regarding the use of the wires, as
long as it could reasonably be expected that the wires were in some manner to be used in
furtherance of the scheme.  *United States v. Mastelotto*, 717 F.2d 1238, 1250 n.12 (9th Cir.
1983), overruled on other grounds, *United States v. Maze*, 414 U.S. 395, 399-400 (1974));

**Government's Trial Brief**                                                                                        **Page 38**

*Pereira v. United States*, 347 U.S. 1, 8-9 (1953). Each use of the wires in a fraudulent scheme constitutes a separate violation. *Garlick*, 240 F.3d at 792.

The government will introduce evidence that Defendants and other coconspirators and co-schemers with whom they share liability caused the use of interstate wires on multiple occasions in furtherance of the scheme to defraud, including the wirings charged in Counts 2 through 29 of the Superseding Indictment.

### C.    Conspiracy to Commit Money Laundering (Count 30)

Defendants are charged in Count 30 with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). For the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

First, there was an agreement to commit money laundering;

Second, the defendant knew the objective of the agreement;

Third, the defendant joined the agreement with the intent to further its unlawful purpose. *See 9th Cir. Crim. Jury Instr.* 18.7A (2022); *United States Jaimez*, 45 F.4th 1118, 1123 (9th Cir. 2022); s*ee also United States Collazo*, 984 F.3d 1308, 1319 (9th Cir. 2021) (en banc); *United States v. Kimbrew*, 406 F.3d 1149, 1152 (9th Cir. 2005); *United States v. Alghazouli*, 517 F.3d 1179, 1189 (9th Cir. 2008) (first element); *United States v. Moreland*, 622 F.3d 1147, 1169 (9th Cir. 2010) (second element).

Here it is alleged that Defendants and others conspired to commit money laundering by knowingly engaging or attempting to engage in monetary transactions that involved criminally derived property with a value greater than $10,000 in violation of 18 U.S.C. § 1957. The elements for that offense are:

/ / /

**Government's Trial Brief**                                                                 **Page 39**

First, the defendant knowingly engaged or attempted to engage in a monetary transaction;

Second, the defendant knew the transaction involved criminally derived property;

Third, the property had a value greater than $10,000;

Fourth, the property was, in fact, derived from mail and wire fraud; and

Fifth, the transaction occurred in the United States.

*See 9th Cir. Crim. Jury Instr.* 18.7 (2022).

The term "monetary transaction" means the deposit, withdrawal, transfer or exchange, in or affecting interstate commerce, of funds or a monetary instrument by, through, or to a financial institution—here federally insured banks.

The term "criminally derived property" means any property constituting, or derived from, the proceeds obtained from a criminal offense. For this case, involving conduct after May 20, 2009, "proceeds" means "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity." 18 U.S.C. § 1957(f)(3); 18 U.S.C. § 1956(c)(9) (Section 1957 subsection (f)(3) was modified by Pub. L. 111-21, 123 Stat. 1618, which also added § 1956 subsection (c)(9)). *See 9th Cir. Crim. Jury Instr.* 18.7 (2022) (comment). Thus, the government must prove that the defendant knew that the property involved in the monetary transaction constituted, or was derived from, proceeds obtained by some criminal offense. The government does not have to prove that the defendant knew the precise nature of that criminal offense, or knew the property involved in the transaction represented the proceeds of mail or wire fraud. Moreover, although the government must prove that, of the property at issue, more than $10,000 was criminally derived, the government does not have to prove that all the property at issue was criminally derived. *9th Cir. Crim. Jury Instr.* 18.7 (2022).

**Government's Trial Brief**                                                                 **Page 40**

Because it is a specific intent crime, it is reversible error to give Instruction 4.8 (Knowingly) in a money laundering case in a manner that indicates the defendant need not know that the money being laundered was proceeds of criminal transactions. *United States v. Stein*, 37 F.3d 1407, 1410 (9th Cir. 1994); *see also United States v. Turman*, 122 F.3d 1167, 1169 (9th Cir. 1997) (applying *Stein* retroactively), *abrogated on other grounds by Henderson v. United States*, 568 U.S. 266 (2013). *But see United States v. Lonich*, 23 F.4th 881, 899-901 (9th Cir. 2022) (concluding district court did not err by using general "knowingly" instruction in money laundering case because district court modified instruction to clarify that it applies only to act of engaging in monetary transactions); *see also Jaimez*, 45 F.4th at 1123.

Evidence at trial will demonstrate that Defendants agreed during the conspiracy to conduct financial transactions exceeding $10,000 to transfer proceeds of wire fraud to, among other things, fund their own lavish salaries and use of luxury resorts, pay for defendant MacRitchie's apartment in New York City, and underwrite coconspirator Olaf Janke's buyout in exchange for deferring his departure. Because Count 30 is a conspiracy charge, the jury need not find that any specific money laundering transaction occurred.

### D. False Statement on a Loan Application (Count 31)

Defendant Jesenik is charged in Count 31 with aiding and abetting the making of a false statement on a loan application, in violation of 18 U.S.C. §§ 2, 1014. The evidence will show that Jesenik aided and abetted the making of a false statement by N. Scott Gillis to Wells Fargo Bank in order to get a $4.2 million advance to ACF under a Receivables Loan Agreement. Among other things, Gillis falsely stated that "[n]o Potential Event of Default or Event of Default has occurred and is continuing," when in truth and in fact, he and Jesenik knew that ACF had already experienced an "Event of Default" as defined in that agreement on more than $2.5

million in principal repayments due to investors in ACF Private Note, with millions of dollars more in defaults expected in the following weeks. Mr. Gillis has already pleaded guilty to making that false statement in violation of 18 U.S.C. § 1014.

A defendant may be found guilty of making a false statement on a loan application, even if the defendant personally did not commit the act or acts constituting the crime but aided and abetted in its commission. To "aid and abet" means intentionally to help someone else commit a crime. To prove a defendant guilty of making a false statement on a loan application by aiding and abetting, the government must prove each of the following beyond a reasonable doubt:

First, someone else committed the offense of making a false statement on a loan application;

Second, the defendant aided, counseled, commanded, induced, or procured that person with respect to at least one element of making a false statement on a loan application;

Third, the defendant acted with the intent to facilitate the offense of making a false statement on a loan application; and

Fourth, the defendant acted before the crime was completed.

*See 9th Cir. Crim. Jury Instr.* 4.1 (2022), construing 18 U.S.C. § 2(a), which is applicable here.

The government is not required to prove precisely which defendant actually committed the crime and which defendant aided and abetted, but the evidence at trial will show that Gillis committed the crime and Jesenik aided and abetted. To prove the underlying substantive crime, the government must prove that:

First, N. Scott Gillis made a false statement to a federally insured bank;

Second, N. Scott Gillis made the false statement to the Wells Fargo Bank knowing it was false; and

**Government's Trial Brief**                                                                                    **Page 42**

Third, N. Scott Gillis did so for the purpose of influencing in any way the action of the bank. *See 9th Cir. Crim. Jury Instr.* 24.11 (2022).

Federally insured status is an element of the crime. *United States v. Davoudi*, 172 F.3d 1130, 1133 (9th Cir. 1999). It is not necessary to prove that Wells Fargo Bank was, in fact, influenced or misled, or that the bank was exposed to a risk of loss. What must be proved is that the defendant intended to influence the bank by the false statement. *Id.* Materiality is not an element of the crime of knowingly making a false statement to a federally insured bank in violation of 18 U.S.C. § 1014. *United States v. Wells*, 519 U.S. 482, 496-97 (1997). Proof of a risk of loss to a financial institution is not an element of the crime. *United States v. Taylor*, 808 F.3d 1202, 1205 (9th Cir. 2015).

The Supreme Court has stated that the federal aiding and abetting statute has two primary components: "a person is liable under § 2 if (and only if) he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission." *Rosemond v. United States*, 134 S. Ct. 1240, 1245 (2014). The defendant's conduct need not facilitate each and every element of the crime; a defendant can be convicted as an aider and abettor even if the defendant's conduct "relates to only one (or some) of a crime's phases or elements." *Id.* at 1246-47. The intent requirement is satisfied when a person actively participates in a criminal venture with advance knowledge of the circumstances constituting the elements of the charged offense. *Id.* at 1248–49; *see also United States v. Goldtooth*, 754 F.3d 763, 769 (9th Cir. 2014) (reversing defendants' convictions for aiding and abetting robbery on Indian reservation because there was no evidence that defendants had foreknowledge that robbery was to occur).

**Government's Trial Brief**                                                      **Page 43**

To prove aiding and abetting the making of a false statement on a loan application, it is not enough that the defendant merely associated with the person committing the crime, or unknowingly or unintentionally did things that were helpful to that person or was present at the scene of the crime. The evidence must show beyond a reasonable doubt that the defendant acted with the knowledge and intention of helping that person commit the offense of making a false statement on a loan application. *See 9th Cir. Crim. Jury Instr.* 4.1 (2022). The government will present that evidence at trial.

### E.     Anticipated Defenses

The government has already briefed arguments related to several anticipated defenses, including good faith, advice of counsel and reliance on professionals, intent to repay or avoid net loss, belief in the ultimate success of the enterprise, compliance with securities laws, and victim negligence in the guise of seeking to apply different standards for sophisticated or accredited investors. (ECF No. 325 at 17-31; ECF No. 347 at 2-11; ECF No. 382 at 10-19). Those arguments are hereby incorporated by reference. The government reserves the right to respond to and challenge any additional defenses that Defendants identify in their trial documents.

## IV.    <u>EVIDENTIARY ISSUES</u>

As the Court is well aware, some of the evidentiary issues that may arise at trial have been addressed by the government in separate pleadings. Those motions are still pending, and we will not repeat those arguments here. Additional evidentiary issues that may arise at trial are discussed below.

### A.     Stipulations

In an effort to streamline the trial, the parties are conferring about proposed stipulations regarding proof of wire transmissions and the admissibility of certain documentary evidence. No

stipulations have been reached to date, but the parties will update the Court and submit any proposed jury instructions if we reach agreement.

**B.      Defendants' Statements and Admissions**

Under Rule 801(d)(2)(A), a party-opponent's own statements are admissible against that party-opponent as non-hearsay. Fed. R. Evid. 801(d)(2). Courts should give "generous treatment to this avenue to admissibility." *See* Fed. R. Evid. 801 Advisory Committee Notes.

The government will seek to introduce each defendant's prior statements and admissions, including statements made to investors during promotional meetings, lulling emails sent to investors, emails sent to employees, associates and coconspirators, statements made to law enforcement, and statements in depositions taken in the SEC enforcement action. Such evidence is admissible as "admissions by a party opponent." Fed. R. Evid. 801(d)(2)(A). These materials have been provided to defense counsel, and it is well settled that a statement by a party may be offered against him as an admission, and therefore, is non-hearsay. *United States v. Nixon*, 418 U.S. 683, 702, n.13 (1974); *United States v. Warren*, 25 F.3d 890, 895 (9th Cir. 1994) ("A defendant's own out-of-court admissions . . . surmount all objections based on the hearsay rule . . . and [are] admissible for whatever inferences the trial judge [can] reasonably draw."). It is also established that writings, such as correspondence, by a defendant may constitute admissions. *United States v. Moran*, 759 F.2d 777, 786 (9th Cir. 1985).

Although the government may offer a statement into evidence against a defendant as an admission, a defendant may not offer his own prior statements on his own behalf for proof of the truth of the matter asserted therein, since these self-serving statements are hearsay. *See United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000) (defendant could not introduce non-self-inculpatory statements because they were inadmissible hearsay).

**Government's Trial Brief**                                                                                    **Page 45**

Nor can defendant seek to introduce such hearsay statements through cross-examination of other witnesses. *United States v. Fernandez*, 839 F.2d 639, 640 (9th Cir. 1988). In *Williamson v. United States*, 512 U.S. 594, 600 (1994), the Court declared that the "fact that a statement is collateral to a self-inculpatory statement says nothing at all about the collateral statement's reliability." The Court went on to find that there was "no reason why collateral statements, even ones that are neutral as to interest . . . should be treated any differently from other hearsay statements that are generally excluded." If a defendant were allowed to introduce his exculpatory statements without subjecting himself to cross-examination, he would be doing precisely what the hearsay rule forbids. *United States v. Fernandez*, 839 F.2d at 640.

## C.     Statements by Defendants' Employees and Agents

The government intends to introduce against Defendants statements made by Aequitas employees within the scope of their employment. Under Rule 801(d)(2)(D), these are non-hearsay statements because they were made by Defendant's agents or employees within the scope of their employment. *See* Fed. R. Evid. 801(d)(2)(D) ("The statement is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship."). "Where an individual defendant controls the entity that employs the declarant, and is the declarant's ultimate supervisor, the employee is an agent of the defendant for purposes of F.R.E. 801(d)(2)(D), and his statements are admissible against that individual defendant." *In re The Reserve Fund*, 2012 WL 12354233 at *4 (S.D.N.Y. 2012) (*citing United States v. Rioux*, 97 F.3d 648, 660-61 (2d Cir. 1996)) (finding statements admissible against defendant sheriff under Rule 801(d)(2)(D) where made by supervisors who were selected by sheriff, received instruction directly or indirectly from sheriff, and could be fired by sheriff)).

**Government's Trial Brief**                                                                 **Page 46**

In *United States v. Kirk*, the government charged the founder of a time share venture with wire fraud and other offenses.  844 F.2d 660 (9th Cir. 1988).  There, the defendant "ran the day-to-day operations" and exercised "control over the time share scheme."  *Id*. at 661.  At trial, the district court admitted hearsay testimony of the company's salespeople, which the Ninth Circuit affirmed on appeal.  The Ninth Circuit determined that the statements were admissible as non-hearsay statements of agents or employees under Fed. R. Evid. 801(d)(2)(D).  *Id*. at 663. Likewise, in *United States v. Gibson*, the government brought wire fraud charges against the founder, sole shareholder, chairman, and president of Gibson Marketing International, Inc. ("GMI"), which sold franchises and franchise distributorship rights. 690 F.2d 697, 699 (9th Cir. 1982).  At trial, the government introduced evidence of statements by GMI employees and salesmen against the defendant.  On appeal, the Ninth Circuit held that testimony from investors regarding statements made to them by GMI employees were not hearsay, and even if the testimony did not fall within the hearsay definition, the testimony was admissible under either Rule 801(d)(2)(D) (statements by an employee) or Rule 801(d)(2)(E) (statements by a co-conspirator). *Id*. at 701.

Other circuits routinely affirm the admission of this kind of evidence as well.  *See United States v. Agne*, 214 F.3d 47, 54-55 (1st Cir. 2000) (finding statements by employee of entity admissible as non-hearsay against president of entity under Rule 801(d)(2)(D), collecting cases); *United States v. Paxon*, 861 F.2d 730, 734 (D.C. Cir. 1988) (finding statements by vice president of closely held corporation admissible against president of corporation).  In this case, Aequitas employees whose statements will be offered were all employed by Defendants through the entities that they controlled.

/ / /

**Government's Trial Brief**                                                                 **Page 47**

### D.        Coconspirator and Co-Schemer Statements

The government will offer against Defendants statements that they, cooperating codefendants, and unindicted coconspirators and co-schemers made during and in furtherance of the conspiracies charged in Count 1 and Count 30 of the Superseding Indictment.  These statements will be in the form of witness testimony and email exhibits.

A jury may consider the truth of a coconspirator's out-of-court statement when the government proves by a preponderance of the evidence that: (1) a conspiracy existed at the time of the statement; (2) the member of the conspiracy against whom the statement is introduced had knowledge of, and participated in, the conspiracy; and (3) the statement was made in furtherance of the conspiracy.  *Bourjaily v. United States*, 483 U.S. 171, 175 (1987).  A showing that the declarant is not available to testify is unnecessary.  *United States v. Paris*, 827 F.2d 395, 400-01 (9th Cir. 1987).

The trial judge, not the jury, determines whether declarations of coconspirators are admissible.  *United States v. Weiner*, 578 F.2d 757, 768 (9th Cir. 1978).  The order of proof lies within the trial judge's discretion.  *United States v. Testa*, 548 F.2d 847, 852 (9th Cir. 1977). The court can conditionally admit an out-of-court statement, subject to a motion to strike if subsequent evidence does not connect it to a conspiracy with the defendant.[5]  *Id*.  Because Rule 801(d)(2)(E) is a "firmly-rooted exception" to the hearsay rule, no further indicia of reliability is necessary. *Bourjaily*, 483 U.S. at 182–83.

---

[5] In the alternative, the court can require a preliminary circumstantial showing of the foundational elements by a preponderance of the evidence, *Bourjaily*, 483 U.S. at 175; *see also United States v. Powell*, 982 F.2d 1422, 1432 (10th Cir. 1992); *United States v. Zavada-Serra*, 853 F.2d 1512, 1514 (9th Cir. 1988), but the Court has already indicated that "[s]uch a departure from standard practice in this circuit is especially unnecessary in this case."  (ECF No. 267 at 39.)

**Government's Trial Brief**                                                                                    **Page 48**

In determining whether a conspiracy exists, relevant areas of inquiry include the nature of the scheme; the identity of the participants; the quality, frequency, and duration of each co-conspirator's transactions; and the commonality of goals and times. *United States v. Torres*, 908 F.2d 1417, 1425 (9th Cir. 1990). To be "in furtherance" of a conspiracy, a statement must advance a common objective of the conspiracy or set in motion a transaction that is an integral part of the conspiracy. *United States v. Yarborough*, 852 F.2d 1522, 1535-36 (9th Cir. 1988). In *Yarborough*, the Ninth Circuit delineated some statements that have been found to be in furtherance of a joint venture: (1) statements made to induce enlistment or further participation in the group's activities; (2) statements made to prompt further action on the part of conspirators; (3) statements made to reassure members of a conspiracy's continued existence; (4) statements to allay a coconspirator's fears; and (5) statements made to keep coconspirators abreast of an ongoing conspiracy's activities. *See id*. The Court should focus on the declarant's intent to further the objectives of the conspiracy rather than the objective effect of the statements. *See United States v. Nazemian*, 948 F.2d 522, 529 (9th Cir. 1991).

A coconspirator declaration need not have been made exclusively, or even primarily, to further the conspiracy. *Garlington v. O'Leary*, 879 F.2d 277, 284 (7th Cir. 1989). Statements related to the concealment of the criminal enterprise and seeking to control damage to an ongoing conspiracy are made "in furtherance of the conspiracy." *United States v. Tille*, 729 F.2d 615, 620 (9th Cir. 1984); *Garlington,* 879 F.2d 277 at 283. Also, "puffing," boasts and other conversation designed to obtain the confidence of another conspirator, are made in furtherance of a conspiracy. *United States v. Santiago*, 837 F.2d 1545, 1549 (11th Cir. 1988); *United States v. Lechuga*, 888 F.2d 1472, 1480 (5th Cir. 1989); *United States v. Miller*, 664 F.2d 94, 98 (5th Cir.

/ / /

**Government's Trial Brief**                                                                 **Page 49**

1981).  A statement can be admitted as a coconspirator declaration even if it is subject to alternative interpretations.  *Id.*

The introduction of such statements at trial does not violate the confrontation clause.  *See* ECF 393 at 3-7; *see also United States v. Allen*, 425 F.3d 1231, 1235 (9th Cir. 2005), *cert. denied*, 547 U.S. 1012 (2006) (holding that co-conspirator statements are not testimonial and therefore not within the holding of *Crawford v. Washington*, 541 U.S. 36 (2004) (confrontation clause of the Sixth Amendment precludes testimonial evidence unless the declarant is unavailable and defendant had a prior opportunity to cross-examine the declarant)).

### E.    Non-hearsay Statements Offered for Notice, Intent, and Effect on Listener

The government will offer statements at trial that are necessary to show notice, effect on the listener, and intent rather than the truth of the matter asserted.  "If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay."  Rule 801(c) advisory committee's note; *see also Calmat Co. v. U.S. Dep't of Lab.*, 364 F.3d 1117, 1124 (9th Cir. 2004) ("If the significance of an out-of-court statement lies in the fact that the statement was made and not in the truth of the matter asserted, then the statement is not hearsay.").

Under this principle, a statement offered to show its effect on the listener is not hearsay. *See United States v. Castro*, 887 F.2d 988, 1000 (9th Cir. 1989) (holding that statements introduced to show that a party had certain information, rather than for the truth of the information, are not hearsay); *Gibbs v. State Farm Mut. Ins. Co.*, 544 F.2d 423, 428 (9th Cir. 1976) (holding that statements were not hearsay if admitted to show that the defendant had received certain information); *George v. Celotex Corp.*, 914 F.2d 26, 30 (2d Cir. 1990) ("To be sure, an out of court statement offered not for the truth of the matter asserted, but merely to show

**Government's Trial Brief**                                                        **Page 50**

that the defendant was on notice of a danger, is not hearsay."); *see also* 2 McCormick On Evid. § 249 (8th ed.).

This also applies to misrepresentations and to other statements that demonstrate intent. *See Kirk*, 844 F.2d at 663 (explaining that "statements of salespersons misrepresenting the program were admissible to prove that the misrepresentations were made, not to prove the truth of what the salespersons stated."); *see, e.g.*, *Haddad v. Lockheed Ca. Corp.*, 720 F.2d 1454, 1456 (9th Cir. 1983) (evidence of complaints to company offered for non-hearsay purpose of showing receipt of complaints by company); *United States v. Beecroft*, 608 F.2d 753, 760-61 (9th Cir. 1979) (evidence of report offered for non-hearsay purpose of showing defendant's knowledge of its contents and awareness of related misrepresentations).

F.    **Hypothetical Questions**

The government intends to call victim investors and RIAs as witnesses in its case-in-chief and to ask these witnesses certain hypothetical questions.  For example, the government intends to ask whether they would have invested in ACF Private Note, IOF II, and the Lux Bond if they had they known various facts about the true nature of the investment.  The government anticipates that the victims will testify that they relied on Defendants' and their coconspirators', co-schemers' and agents' materially false representations and half-truths, and that, but for these misrepresentations and half-truths, they would not have invested their money.

Such questions are "plainly relevant and probative."  *United States v. Laurienti*, 611 F.3d 530, 549 (9th Cir. 2010).  In *Laurienti*, "[i]n order to establish materiality of Defendants' actions, the government asked questions such as, 'If you had known prior to purchasing [a house stock] that Hampton Porter prevented or discouraged their brokers from allowing their clients to sell their shares of [the house stock], would you have purchased the [shares of the house stock]?'".

*Id.*  The Ninth Circuit found those questions were probative to the central issue of guilt, and the government could ask them of its own fact witnesses.  *Id.* (citing *United States v. Jennings*, 487 F.3d 564, 581–82 (8th Cir.2007) (holding that, unlike with respect to character witnesses, it is generally permissible to ask guilt-assuming hypotheticals of fact witnesses to prove materiality). Such questions are allowed because "witnesses will merely be providing 'what-if-you-had-known' testimony which has been recognized as a useful tool for eliciting testimony on fraud issues and which is admissible as either fact or opinion testimony."  *United States v. Swenson*, No. 1:13-CR-00091-BLW, 2014 WL 354702, at *2 (D. Idaho Jan. 31, 2014) (*citing United States v. Cuti*, 720 F.3d 453, 459 (2d Cir. 2013); *Laurienti*, 611 F.3d at 549.

In *United States v. Ranney*, 719 F.2d 1183, 1188-89 (1st Cir. 1988), the court upheld the trial court's decision to allow the government to ask victims of a wire fraud scheme hypothetical questions, stating that "was not only merely defensible but eminently correct."  The victims were asked if they would have made investments if they had known that certain representations made by the defendants were in fact false.  *Id*. at 1187.  In reaching its conclusion, the Court stated that the questions pertained to matters of which the victims had personal knowledge and that answers were relevant to the issue of whether the defendants' representations were capable of misleading customers.  *Id*. at 1188.  The Court added that the questions did not violate Rule 403, as the answers were not prejudicial to the defendants, but were probative of the nature of the defendants' sales pitch.  The Court also observed:

> That certain evidence tends to incriminate a defendant is insufficient to establish *unfair* prejudice under rule 403.  After all, the entire purpose for introducing evidence at a criminal trial is to establish the defendant's guilt or innocence.

*Id*. at 1188.

/ / /

**Government's Trial Brief**                                                                                        **Page 52**

The government also is permitted to present the testimony of victims concerning their "impressions" of statements by, or information from, Defendants and their coconspirators and agents.  The Ninth Circuit has ruled that the "state of mind" of a victim is not inadmissible opinion testimony; rather it is related to an issue of fact in fraud cases, that is, whether the mail or wire communications were capable of misleading the recipients.  *Phillips v. United States*, 356 F.2d 297, 307-08 (9th Cir. 1965).  Answers to such questions speak to a victim's state of mind at the time of the defendant's representation—a fact which, like the answers to the hypothetical questions discussed above, is probative of the deceptive nature of the sales pitch.

### G.    Documentary Evidence

Most of the government's exhibits are documents, and the vast majority of them are from the Receiver's Ringtail database, which comprises Aequitas's digital books and records.  These documentary exhibits include Aequitas employees' emails and other business records such as PPMs, "tear sheets," other marketing materials, loan agreements, financial statements and records, collateral schedules, fund performance summaries, asset purchase agreements, PowerPoint presentations, subscription agreements, property rental agreements, consulting agreements, payroll registers, meeting agendas and minutes, and expense reports.  The email exhibits are primarily to, from, or between Defendants, coconspirators, or other Aequitas employees.  They also include emails between Aequitas employees and investors or RIAs, and communications with outside counsel.

The government is seeking a stipulation with defense counsel regarding the admissibility of these documents with the hopes of preadmitting as many exhibits as possible so evidence can be presented efficiently at trial.  If the parties do not reach stipulations, the government may need to call custodians of record to authenticate the evidence.

**Government's Trial Brief**                                                                                    **Page 53**

### 1.    Foundation and Authentication

The requirement of authentication is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.  Fed. R. Evid. 901(a).  The government "need only make a prima facie showing of authenticity 'so that a reasonable juror could find in favor of authenticity.'" *United States v. Workinger*, 90 F.3d 1409, 1415 (9th Cir. 1996) (quoting *United States v. Chu Kong Yin,* 935 F.2d 990, 996 (9th Cir. 1991).  Rule 901 provides a number of illustrative examples for authenticating documents, including the testimony of a witness with knowledge.  Fed. R. Evid. 901(b)(1).  For example, witnesses who either received a document from a defendant or were involved in the preparation or authorized the preparation of the document would have the requisite knowledge for authentication purposes.  Establishing a formal chain of custody of evidence is not required.  *See, e.g., Gallego v. United States*, 276 F.2d 914, 917 (9th Cir. 1960).  It is sufficient for the party offering the evidence simply to satisfy the court that the item is what it purports to be and has not been altered. *United States v. Harrington*, 923 F.2d 1371, 1374 (9th Cir. 1991).  Defects in the chain of custody go to the weight of the evidence and not to the document's admissibility. *Id*. at 1374.

A number of the government's exhibits are self-authenticating business records and the government will submit a certification of a records custodian pursuant to Federal Rule of Evidence 902(11).  Self-authentication of certain documents, pursuant to Rule 902, eliminates the requirement of providing extrinsic evidence of authenticity.  Included among this category are certified domestic and foreign records of regularly conducted activity.  For business records, the government must produce the custodian or other qualified witness to testify that the documents were made and kept in the regular course of business.  This witness, however, need not have personally participated in or observed the creation of the document.

Moreover, "there is no requirement that the government establish when and by whom the documents were prepared." *United States v. Ray*, 930 F.2d 1368, 1370 (9th Cir. 1990). The court has "'wide discretion' in determining whether a business record meets the trustworthiness standard." *United States v. Scholl*, 166 F.3d 964, 978 (9th Cir. 1999). As a general rule, inaccuracies or incompleteness in business records go only to the relative weight of the evidence and do not affect its admissibility under Rule 803(6). *United States v. Catabran*, 836 F.2d 453, 458 (9th Cir. 1988); *See also La Porte v. United States*, 300 F.2d 878, 880 (9th Cir. 1962).

The government also intends to offer copies of certain documents into evidence during the trial. Federal Rule of Evidence 1003 permits the use of copies unless a genuine question is raised as to the authenticity of the original, or unless it would be unfair to admit the duplicate in lieu of the original.

### 2.      Emails and Other Business Records

Emails and other business records made and kept in the regular course of business are admissible pursuant to Rule 803(6) of the Federal Rules of Evidence. Aequitas's copies of such documents are consolidated in the Ringtail database, which the Receiver created specifically for the purpose of giving civil and criminal litigants—including Defendants—access to Aequitas's business records. (ECF No. 57 at 3.) Even where a document was originally created by a non-Aequitas entity, the Receiver can lay the entire foundation for its admission by demonstrating that Aequitas incorporated the document into its records and relied on it, just as the Receiver can also supply the other foundational elements. *United States v. Childs*, 5 F.3d 1328, 1332-34 (9th Cir. 1993) (certificates of title and purchase orders admitted as records of automobile dealership even though not prepared by them); *United States v. Flom*, 558 F.2d 1179, 1182 (5th Cir. 1977) (invoices in defendant's files prepared and sent by another company admissible without

**Government's Trial Brief**                                                                              **Page 55**

testimony from preparer); *United States v. Bueno-Sierra*, 99 F.3d 375, 378 (11th Cir. 1996)

(finding documents created by shipping companies but produced by Port of Miami were properly

admitted); *United States v. Parker*, 749 F.2d 628, 633 (11th Cir. 1984) (affirming district court's

admission of export records prepared by Scottish distillery and produced by American

distributor).

Emails qualify as business records under Federal Rule of Evidence 803(6) when (1) they

are kept in the course of a regularly conducted business activity and made as a regular practice,

(2) they are written at or near the time of the event, and (3) the opponent fails to show they are

untrustworthy. *United States v. Lischewski*, 860 F. App'x 512, 516 (9th Cir. 2021), *cert. denied*,

212 L. Ed. 2d 762, 142 S. Ct. 2676 (2022); *see also* 30B Wright & Miller, Fed. Prac. & Proc.

§6864 (2020 ed.) ("An email can qualify for admission under Rule 803(6)."). Although email

was at one time "less of a systematic business activity," *Monotype Corp. v. Int'l Typeface Corp.*,

43 F.3d 443, 450 (9th Cir. 1994), courts now recognize that "an email can qualify as an

admissible record of a regularly conducted business activity as long as the proponent satisfies the

requirements of Rule 803(6)." *United States v. Daneshvar*, 925 F.3d 766, 777 & n.3 (6th Cir.

2019) (excluding emails where proponent "did not offer a qualified witness"); *see United States

v. Cone*, 714 F.3d 197, 219-20 (4th Cir. 2013) (finding no reversible error in admitting emails

that did not, "on this record," satisfy Rule 803(6)); *United States v. Millegan*, No. 3:19-CR-

00528-IM, 2022 WL 1913289, at *3 (D. Or. June 2, 2022) (statements in emails admissible as

business records under Rule 803(6) if government produces a Rule 901 certification); *United

States v. Balwani*, No. 5:18-CR-00258-EJD-1, 2022 WL 597040, at *25 (N.D. Cal. Feb. 28,

2022) ("as a general principle, emails can serve as business records"). The district court has

"wide discretion" in determining whether an email meets Rule 803(6)'s "trustworthiness

**Government's Trial Brief**                                                                                    **Page 56**

standard." *Lischewski*, 860 F. App'x at 516 (*quoting Scholl*, 166 F.3d at 978 (explaining that "inaccuracies, ambiguities, or omissions go to the weight and not the admissibility of the evidence")).

The Court should admit the proposed Aequitas emails as business records under Federal Rule of Evidence 803(6).  In the absence of a stipulation, the government anticipates submitting a Rule 902 certification and/or testimony from former Aequitas executives and employees to establish that emails were used as the primary method of communication at the company, that Aequitas personnel routinely sent and received emails in the regular course of business and to conduct their work, that it was their regular practice to send emails at or near the time of the events described within the emails, that the people sending such messages had knowledge of the underlying events described within the emails, that it was important for Aequitas employees to accurately convey information because other individuals in the company would rely on and take action based on the information conveyed, that the information was memorialized in email in part so that employees could refer back to the information later, and the emails retrieved from the Ringtail database are true and correct copies of emails created and maintained in the course of Aequitas's regularly conducted business activity.  Such testimony establishes a sufficient foundation to admit Aequitas emails as business records under Federal Rule of Evidence 803(6). Federal Rules of Evidence 803(6) and 902(11) "go hand in hand."  *United States v. Razo-Quiroz*, No. 1:19-CR-00015 DADBAM, 2019 WL 3035556, at *13 (E.D. Cal. July 11, 2019) (*quoting United States v. Kahre*, 610 F. Supp. 2d 1261, 1263 (D. Nev. 2009) (cleaned up).  Declarations filed under Federal Rules of Evidence 902(11) are the functional equivalent to live testimony, do not run afoul of the Confrontation Clause, and may therefore be relied upon in criminal cases. *Id*.; *see also United States v. Siders*, 712 Fed. App'x 601, 602 (9th Cir. 2017).

**Government's Trial Brief**                                          **Page 57**

## H.      Summary Exhibits and Witnesses

To streamline the presentation of evidence for the jury, the government intends to use summary exhibits in its case-in-chief.  The government intends to call IRS Special Agent Katherine Fearn and Brad Foster to present testimony and summaries of voluminous financial records.  Both witnesses will be subject to cross examination.  Charts and summaries of evidence are governed by Rule 1006, which permits the introduction of charts, summaries, or calculations of voluminous writings, recordings, or photographs which cannot conveniently be examined in court. See Fed. R. Evid. 1006.  Accordingly, a summary chart may be admitted as substantive evidence when the proponent establishes that the underlying documents upon which the summary is based are voluminous, admissible, and available for inspection.  *Id.*; *see also Meyers*, 847 F.2d 1408 at 1412.

The proponent of a summary under Rule 1006 must establish the admissibility of the underlying documents as a condition precedent to introduction of the summary.  *United States v. Johnson*, 594 F.2d 1253, 1257 (9th Cir. 1979). The proponent must also establish that the underlying documents were made available to the opposing party for inspection.  *Paddack v Dave Christensen, Inc.*, 745 F.2d 1254, 1259 (9th Cir. 1984).  Evidence may be summarized by any qualified person who has examined the original documents and heard the testimony in court. *See e.g., Goldberg v. United States*, 789 F.2d 1341, 1343 (9th Cir. 1986). Any cross-examination should be limited to that covered by summary testimony. *United States v. Killough*, 848 F.2d 1523, 1529 (11th Cir. 1988).  Agent Fearn's summaries are in the process of being completed and will be provided to counsel prior to trial.

The Ninth Circuit has repeatedly approved the use of Rule 1006 summaries, particularly where, as here, the summaries will aid in organizing the information contained in a large number

**Government's Trial Brief**                                                                                          **Page 58**

of documents into understandable form. *See Goldberg*, 789 F.2d at 1343 (testimony concerning summaries of voluminous tax records permitted); *United States v. Shirley*, 884 F.2d 1130, 1133 (9th Cir. 1989) (summary charts of telephone calls permitted to help jury organize and evaluate evidence); *Keith v. Volpe*, 858 F.2d 467, 479-80 (9th Cir. 1988) (summaries necessary to clearly present relevant facts in Government agency files).

At trial, the government will also offer an overall timeline that summarizes key events during the Count 1 fraud conspiracy. The government anticipates using a timeline during opening statements as a demonstrative aid and plans to use the completed exhibit during closing argument. The government plans to "construct" that timeline incrementally during trial as evidence is adduced. Those incremental pieces will be used only for demonstrative purposes, but the resulting, completed timeline will be offered as evidence for the jury's use during deliberation. The evidence in this case is voluminous, and putting those pieces of evidence together in a chronological summary would be admissible under Fed. R. Evid. 1006 and under Rule 611(a) (empowering court to "exercise reasonable control" over presentation of evidence in pursuit of efficacy and avoiding time waste); *see United States v. Anekwu*, 695 F.3d 967, 982 (9th Cir. 2012) (affirming admission of summary exhibit to aid jury's deliberation, although noting general disfavor for summaries of already-admitted evidence); *see also United States v. Boulware*, 470 F.3d 931, 936 (9th Cir. 2006) (same).

Summary charts may be used by the government in its opening statement. Indeed, "such charts are often employed in complex conspiracy cases to provide the jury with an outline of what the government will attempt to prove." *United States v. De Peri*, 778 F.2d 963, 979 (3d Cir. 1985) (approving government's use of chart); *United States v. Rubino*, 431 F.2d 284, 290 (6th Cir. 1970) (same). Rule 1006 does not require that it be literally impossible for the trier-of-

fact to examine the underlying records before a summary may be admitted. *See Shirley*, 884 F.2d at 1133; *United States v. Stephens*, 779 F.2d 232, 238-39 (5th Cir. 1985); *United States v. Scales*, 594 F.2d 558, 562 (6th Cir. 1979).  Further, the fact that the underlying documents are already in evidence does not mean that they can be "conveniently examined in court." *Stephens*, 779 F.2d at 239; *United States v. Lemire*, 720 F.2d 1327, 1347 (D.C. Cir. 1983).

## I.      Demonstrative Exhibits

The government intends to offer a number of demonstrative exhibits, and it will provide copies to defense counsel and the Court in advance of trial.  These will include timelines, flowcharts, organizational charts with photographs and titles of the Defendants and other key Aequitas personnel, organizational charts of the relevant Aequitas entities, and other visual aids. These demonstrative aids will help the jury follow the evidence presented during this long and document-intensive trial.

## J.      Federal Rule of Evidence 404(b) Notice

Coconspirator Brian Oliver will testify that Defendant Jesenik avoided using emails for anything controversial, and cautioned Oliver about using his Aequitas email account to discuss things that could be problematic.  In approximately 2011, when Aequitas was involved in litigation, Jesenik told Oliver something to the effect "this is why we don't put things in emails." This statement is admissible as an admission of a party-opponent.

This evidence is also admissible as direct evidence of the scheme to defraud and of Defendant Jesenik's intent to defraud because it is "inextricably intertwined" with evidence of the crimes charged in the Superseding Indictment.  Direct evidence that provides context to the charged conduct is not "other bad acts," and is admissible.  *See United States v. Carpenter*, 923 F.3d 1172, 1181 (9th Cir. 2019) (the circumstances of the initial drug-trafficking incident and

missing drugs were necessary to provide a "coherent and comprehensible story" regarding the background for the victim's kidnapping); *United States v. Beckman*, 298 F.3d 788, 794 (9th Cir. 2002) (testimony regarding the defendant's prior drug run was necessary to provide a "coherent and comprehensible story" regarding the crimes for which the defendant was charged and also went to refuting claim of blind mule or happenstance); *United States v. King*, 200 F.3d 1207, 1215 (9th Cir. 1999) (testimony of the defendant's former acquaintance and business associate to explain the general nature of the defendant's business activity, was "circumstantial evidence [that] gives . . . a context in which these transactions took place"; it was not evidence of other crimes or acts outside the scope of the indictment but was direct evidence, "inextricably intertwined" with evidence of the crime charged); *United States v. Williams*, 989 F.2d 1061, 1070 (9th Cir. 1993) (testimony regarding earlier cocaine transactions focused on defendant's usual mode of doing business at a motel was not 404(b) evidence but was inextricable from and provided necessary context for the witness's testimony about the charged conduct).

In the alternative, if the Court were to find it is not inextricably intertwined, the evidence would be admissible under Federal Rule of Evidence 404(b). That provision permits the introduction of "[e]vidence of any other . . . act" for nonpropensity purposes, such as to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). The Ninth Circuit has stated that "other act" evidence is admissible pursuant to Rule 404(b) "if it (1) tends to prove a material point in issue; (2) is not too remote in time; (3) is proven with evidence sufficient to show that the act was committed; and, (4) if admitted to prove intent, is similar to the offense charged." *Beckman*, 298 F.3d at 794. Rule 404(b) is "a rule of inclusion." *United States v. Ayers*, 924 F.2d 1468, 1472–73 (9th Cir. 1991). "Evidence of other crimes or acts is admissible under Rule 404(b), except where it tends

to prove *only* criminal disposition." *Id*. (internal quotations omitted).  Here, the evidence would be admissible to prove motive, intent, preparation, plan, knowledge, and absence of mistake.

### K.    Expert Testimony

The government intends to call two expert witnesses during trial and has argued the scope and admissibility of their testimony in separate filings.  In addition to testifying as an expert, Brad Foster may also provide lay testimony about Aequitas's operations and financial records. The use of a witness for both expert and lay testimony is permissible, although district courts should instruct jurors about how to evaluate dual-role testimony.  *United States v. Holguin*, 51 F.3d 841, 862 (9th Cir. 2022).  In the event that Mr. Foster provides both expert and lay testimony, the Court may use the Dual Role Testimony instruction set forth in the Government's Proposed Jury Instructions.  *See* Ninth Circuit Model Jury Instructions § 3.15 (2022).

## V.    <u>JUROR NOTEBOOKS</u>

The government proposes that each juror receive a notebook to use throughout the trial for reference.  This would contain demonstrative aids and other documents approved by the Court to help jurors understand and follow the evidence that will be adduced throughout this lengthy trial.

## VI.    <u>FORFEITURE ALLEGATIONS</u>

The Superseding Indictment contains two forfeiture allegations, giving Defendants notice that the government seeks forfeiture of certain property in the event they are convicted of Conspiracy to Commit Mail and Wire Fraud, Wire Fraud, or Conspiracy to Commit Money Laundering.  *See* ECF 171 at 11-13.  If Defendants are convicted at trial, the government expects to seek a money judgment determined by the Court at sentencing pursuant to Fed. R. Crim. P. 32.2 rather than pursue forfeiture of any specific asset.  As a result, the jury will not be required

to hear a forfeiture phase of the trial in the event of a conviction, and the Government is not

providing any forfeiture-related jury instructions or special verdict form. *See* Rule 32.2(b)(1)(A).

## VII.    <u>CONCLUSION</u>

The foregoing is a summary of issues the government anticipates may arise at trial.

Should any additional legal issues arise that have not been addressed in this brief, the

government respectfully requests leave to address those issues in due course.

Dated: March 6, 2023                            Respectfully submitted,

NATALIE K. WIGHT
United States Attorney


*/s/ Ryan W. Bounds*
RYAN W. BOUNDS, OSB #000129
CHRISTOPHER L. CARDANI, MAB #550609
SIDDHARTH DADHICH, TSB #24096310
Assistant United States Attorneys